# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Thompson, | Civ. No. 11-1704 (DWF/JJK) |
| Plaintiff, | |
| v. | |
| Cal R. Ludeman, Dennis Benson, Greg Carlson,  Kevin  Moser, David Prescott, Janine Herbert, Tom Lundquist, Elizabeth Barbo, Blake Carey, Brian Ninneman, Debbie Thao, Julie Rose, Allison Collins, Laurie Severson, Terry Kneisel, Elizabeth Wyatt, and Terry Barnes, each in their individual capacity and in their official capacity as employees of the department of Human Services, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Joseph Thompson, Minnesota Sex Offender Program, 1111 Hwy. 73, Moose Lake, MN 55767, pro se.

Ricardo Figueroa, Minnesota Attorney General's Office, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. No. 15).  The case has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons discussed below, this Court recommends that Defendants' motion be granted in part and denied in part.

1

## BACKGROUND

In 2006, a Minnesota court found Plaintiff to be a sexual psychopathic personality ("SPP") and a sexually dangerous person ("SDP"),[1] and ordered his indeterminate commitment to the Minnesota Sex Offender Program ("MSOP"). (Doc. No. 9, Am. Compl. ¶ 29.)  Plaintiff is currently civilly committed to the MSOP at the Minnesota Correctional Facility in Moose Lake, Minnesota, and resides in "Unit Omega" there.  (*Id.* at 1.)

Plaintiff has commenced this action pursuant to 28 U.S.C. § 1983, against various state employees for violations of his constitutional rights.  The Defendants include the following:

- Cal R. Ludeman, the Commissioner of the Minnesota Department of Human Services ("DHS");

- Dennis Benson, the CEO of MSOP and a member of the clinical team;

- Greg Carlson, Program Director for the Sexual Predator Program at MSOP and a member of the clinical team;

- Kevin Moser, Assistant Program Director for the Sexual Predator Program at MSOP and a member of the clinical team;

- David Prescott, a clinical administrator at MSOP;

- Janine Herbert, a clinician at MSOP;

---

[1]    "Sexual psychopathic personalities" are persons whose conduct evidences an utter lack of power to control their sexual impulses, Minn. Stat. § 253B.02, subd. 18b, and "sexually dangerous persons" are persons who, because of their history and condition, are likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253B.02, subd. 18c(a).

- Tom Lundquist, Program Director for the Sexual Predator Program at MSOP and a member of the clinical team;

- Elizabeth Barbo, a clinician at MSOP;

- Blake Carey, an Assistant Group Supervisor at MSOP;

- Brian Ninneman, a unit supervisor of Unit Omega at MSOP;

- Debbie Thao, a clinician at MSOP and supervisor to Plaintiff's clinical team;

- Julie Rose, a clinician at MSOP and one of Plaintiff's primary therapists;

- Allison Collins, a clinician at MSOP and one of Plaintiff's primary therapists;

- Laurie Severson, the "security issues person in MSOP [U]nit [O]mega";

- Terry Kneisel, Program Manager of Unit Omega;

- Elizabeth Wyatt, a security counselor in Unit Omega's third shift at MSOP; and

- Terry Barnes, a security counselor in Unit Omega's second shift at MSOP.

(Am. Compl. ¶¶ 8–24.)  Each Defendant is sued in his or her individual and official capacities.  (*Id.* ¶ 25.)

Plaintiff alleges thirteen causes of action in his Amended Complaint, and within those causes of action he alleges violations of his First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendment rights under the U.S. Constitution, violations of the Minnesota Constitution, and violations of state law.  These causes of action are as follows:

(1)    The First Cause of Action is for "Failure to Provide Treatment," and

3

is based on Defendants' "unreasonable and unwarranted failure to provide

[P]laintiff the best available and most qualified treatment in violation of his rights,

privileges and immunities guaranteed by the Fifth and Fourteenth Amendment to

the United States Constitution, . . ."  (Am. Compl. ¶ 197.)

(2)    The Second Cause of Action is for "Unreasonable Restriction of Free

Speech," and is based on Defendants' "unreasonable and unwarranted

restrictions on [P]laintiff's right to freedom of speech and expression and his right

to freedom of religion in violation of his rights, privileges and immunities

guaranteed by the First Amendment of the United States Constitution . . ."  (*Id.*

¶ 199.)

(3)    The Third Cause of Action is for "Unreasonable Searches and

Seizures," and is based on Defendants' "unreasonable searches and seizures in

violation of his rights, privileges and immunities guaranteed by the Fourth

Amendment of the United States [C]onstitution . . ."  (*Id.* ¶ 201.)

(4)    The Fourth Cause of Action is for "Invasion of Privacy," and is based

on Defendants' "unreasonable and gross invasion of [P]laintiff's privacy in

violation of his rights, privileges and immunities guaranteed by the Fourth

Amendment of the United States Constitution . . ." (*Id.* ¶ 203.)

(5)    The Fifth Cause of Action is for "Denial of Access to Legall [sic]

Materials and Counsel," and is based on Defendants' "deprivations of [P]laintiff's

constitutional right to legal materials and right to counsel in violation of his rights

guaranteed under the Sixth Amendment of the United States Constitution . . ."

(*Id.* ¶ 205.)

(6)    The Sixth Cause of Action is for "Denial of the Right to be Free from Punishment," and is based on Defendants' "deprivation of [P]laintiff's constitutional right to be free from punishment in violation of his rights guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution . . ." (*Id.* ¶ 207.)

(7)    The Seventh Cause of Action is for "Denial of the Right to Religion and Religious Freedom," and is based on Defendants' "deprivations of [P]laintiff's constitutional right to religion and arbitrarily burdened his religious freedom in violation of his rights guaranteed under the First, Fifth and Fourteenth Amendments of the United States Constitution . . ." (*Id.* ¶ 209.)

(8)    The Eighth Cause of Action is for "Denial of Less Restrictive Alternative," and is based on Defendants' "deprivation of [P]laintiff's constitutional right to a less restrictive alternative placement [and it] is a violation of his rights guaranteed under the Fifth and Fourteenth Amendment to the United States Constitution . . ." (*Id.* ¶ 211.)

(9)    The Ninth Cause of Action is for "Denial of the Right to be Free F[ro]m Cruel and Unusual Punishment," and is based on Defendants' "deprivations of [P]laintiff's constitutional right to be free from cruel and unusual punishment in violation of his rights guaranteed under the First, Fifth and Fourteenth Amendments of the United States Constitution . . ." (*Id.* ¶ 213.)

(10)    The Tenth Cause of Action is for "Denial of the Right to be Free from

Double Jeopardy," and is based on Defendants' "deprivations of [P]laintiff's constitutional right to be free from double jeopardy in violation of his rights guaranteed under the First, Fifth and Fourteenth Amendments of the United States Constitution . . ." (*Id.* ¶ 215.)

(11)    The Eleventh Cause of Action is for "Intentional Infliction of Emotional Distress," and is based on Defendants' actions, which allegedly "speak[] of the extreme and outrageous, was done either intentionally or recklessly, and cause plaintiff extreme emotional distress, which no reasonable person could be expected to endure."  (*Id.* ¶ 217.)

(12)    The Twelfth Cause of Action is for "Negligent Infliction of Emotional Distress," and is based on Defendants' actions, which allegedly "show[] [that] [P]laintiff was subje[c]ted to a zone of danger of physical impact, causing [P]laintiff to reasonably . . . fear for his own safety and . . . suffer severe emotional distress with attendant physical manifestations."  (*Id.* ¶ 219.)

(13)    The Thirteenth Cause of Action is for "Violation of Court Ordered Treatment," and is based on Defendants' actions, which allegedly "shows that MSOP has denied [P]laintiff court ordered treatment[,]" in violation of a court order.  (*Id.* ¶ 221.)

In Plaintiff's sixty-one-page Amended Complaint, he cites to numerous policies, procedures, and conditions of confinement that he claims, when considered together and in context, violate his constitutional rights.  In his introduction, Plaintiff characterizes his various claims as follows:

[T]he conditions of his confinement are unconstitutionally restrictive; the defendants have unconstitutionally restricted his liberty; the defendants have unconstitutionally imposed punishment without due opportunity to be released.  The policies controlling the conditions of confinement are nearly identical to those for criminals serving their sentences, but [P]laintiff has already served the sentence imposed upon him.  Plaintiff has a constitutional right to adequate health care and to a therapeutic environment.

 . . . The defendant[s'] policies and procedures are a shocking restraint on Mr. Thompson's liberty that is intended to punish him. The defendants have failed to successfully treat and rehabilitate any single patient in the care of MSOP, since its entire existence.  The Civil Commitment and Treatment Act as-applied [sic] to Mr. Thompson are so punitive in fact that it cannot be seen as civil in nature.  If proven at trial, the alleged civil rights violations amount to a violation of the United States Constitution Prohibition against cruel and unusual punishment and the prohibition against Double Jeopardy.

(Am. Compl. at 1–2.)  Plaintiff also states that "[a]lthough [he] believes that Chapter 253B is unconstitutional he is not challenging his Chapter 253 in this litigation.  This litigation addresses only the treatment he has or has not received while he has been confined, the unconstitutional punishment that has been imposed on him while he has been confined, and the overly restrictive conditions under which he is confined."  (*Id.* ¶ 30.)

Specifically, Plaintiff alleges, presumably in support of his "Failure to Provide Treatment" and "Violation of Court Ordered Treatment" claims, that he is entitled to all constitutionally required care and treatment, that Faribault County ordered Defendants to provide treatment that is consistent with professional and clinical standards of care under the law, and that Defendants have violated the court order for treatment by failing to treat and release anyone.  (*Id.* ¶ 31.)

7

Plaintiff asserts that Defendants are responsible for providing him treatment and that since February 2011 Defendants have denied him treatment. (*Id.* ¶¶ 32–33.) More specifically, he asserts that he was committed because of some unspecified "mental abnormality," and that Defendants have not clinically diagnosed this mental abnormality and as a consequence have not developed a specific or appropriate treatment plan for him. (*Id.* ¶¶ 34, 36.) He alleges that he has repeatedly requested and been denied more frequent and intensive individualized treatment sessions than the one-hour-per-week support group that is being provided, and he has not been permitted to attend any group therapy session. (*Id.* ¶¶ 37–38.) He claims that Defendants (including Plaintiff's primary therapists Defendant Collins and Defendant Rose) are not themselves, nor have they provided him with treatment by, psychiatrists or  licensed clinical psychologists trained, qualified, certified, or licensed to provide meaningful treatment to a person classified as SPP or SDP. (*Id.* ¶ 35.) And he asserts that Defendants have failed or refused to provide him with medications to treat his depression and other possible emotional disorders, and have not made appropriate "emotion management" available to him. (*Id.* ¶¶ 39–40.)

In support of Plaintiff's "Denial of the Right to be Free from Punishment" claim, he alleges generally that because he is currently not incarcerated for the conviction of a crime, any punitive actions against him are unconstitutional. (*Id.* ¶ 41.)    In further support of this claim (and presumably in support of various of his other claims) he asserts that he was punished in a variety of ways, there were

8

no legitimate security or treatment concerns justifying the punishment, and that
Defendants provided him no due process prior to taking the punitive actions. (*Id.*
¶¶ 42–43.) He lists the following as examples of the punitive actions taken
against him: "denying him meals, denying him the right to telephone legal aid,
denying him the right to request copies of written policies and procedures
governing the operations of MSOP, 'miss placing' [sic] his property, which then
took at times months to find, den[ying] him . . . recreational activities, punishing
Mr. Thompson twice for the same write-up, delaying his mail, and lockdowns."
(*Id.* ¶ 44.) In addition, Plaintiff alleges that Defendants punish MSOP residents if
they allegedly violate MSOP's rules of conduct or otherwise misbehave by
placing them on "Restriction Status," which restricts the person's rights and
privileges that they otherwise would have at MSOP. (*Id.* ¶ 45.) He alleges that
Defendants placed him on "Restriction Status" for months at a time for "perceived
violations of MSOP's rules of conduct or some other misbehavior." (*Id.* ¶ 46.) He
claims that he did not refuse to follow any staff orders, yet some of the restriction
status reports indicated that he had "fail[ed] to comply." (*Id.* ¶ 47.) He alleges
that prior to being placed on "Restriction Status," the Defendants did not advise
him on the matter, did not provide him notice or a hearing either before or after
the decision, and did not advise him of a right to appeal the "Restriction Status."
(*Id.* ¶ 48.)

    Plaintiff also more specifically alleges some examples of actions taken by
Defendants that were punitive in nature. First, regarding "lockdowns," he alleges

that Defendants have established a policy that gives MSOP staff unilateral discretion to lock residents in their rooms for any reason, and that it was common for Defendants to punish residents by locking them in their room for several hours a day and that he has been on lockdown on a few occasions. (*Id.* ¶¶ 49, 52.) He claims that he was locked down whenever staff believed him to be confrontational, to question authority, or when he challenged "arbitrary or unfair actions by staff members." (*Id.* ¶ 51.) He also claims that he and others housed on the Omega Unit have been "locked down" when other residents outside the Omega Unit were the ones involved in the incidents. (*Id.* ¶ 50.) He asserts that he complained to Defendants a number of times about him being punished by being locked in his room, but they did nothing to stop it. (*Id.* ¶ 53.)

Second, Plaintiff alleges that Defendants have established a policy to deny residents use of the gym or yard as a form of punishment for violating rules, and they have denied him access to them as well. (*Id.* ¶¶ 55–56.) Specifically, Plaintiff asserts that he was denied the yard for over thirteen weeks straight, and that it was Defendant Ninneman who denied him the use as punishment for an alleged violation of a rule or for some other misbehavior. (*Id.* ¶ 57.) He also claims that Defendants denied him access to a gym class without due process, which class was to be used as a form of anger management, because he apparently violated rules by not being escorted back from the gym class. (*Id.* ¶ 59.) In addition, Plaintiff claims that on one occasion Defendants denied him and others the use of the gym and yard for several days because one resident

10

had been found to violate a rule regarding the use of profanity.  (*Id.* ¶ 60.)  On this occasion, Defendants Benson, Carlson, and Ninneman explained that "all residents share the responsibility of maintaining the gym and that staff expected other residents to force the offending residents to correct his behavior."  (*Id.*)

Third, Plaintiff alleges that Defendants have punished him by refusing him employment without due process; he asserts that he made several requests to work that were denied.  (*Id.* ¶¶ 61–62, 65.)  Specifically, he alleges that he put in requests to Defendants Collins and Thao about stuffing envelopes for employment, but that Defendant Collins told him "No" because Plaintiff was not participating in treatment (even though Plaintiff had been asking to be allowed to participate in treatment).  (*Id.* ¶ 63.)  He also explains that MSOP policy states that residents are not allowed to work while on some restriction status; he has asked whether he could continue to stuff envelopes while on restrictions but his request has been denied by Defendants.  (*Id.* ¶ 64.)

Fourth, Plaintiff alleges that MSOP staff, with the approval of Defendants and at the direction of Defendant Benson and Defendant Carlson and without due process being provided, have taken furniture out of the day-room in Unit Omega and in the facility hallways as a form of punishment and to hamper Plaintiff and the other residents' right to associate.  (*Id.* ¶¶ 66–67, 71.)  Plaintiff asserts that Defendant Ninneman told him that the furniture was removed "so that he and other residents would put pressure on the offending residents to follow the rules."  (*Id.* ¶ 67.)  Other items that have been removed are televisions,

11

and a small book shelf that had books and games on it.  (*Id.* ¶¶ 68–69.)  Plaintiff asserts that when he and other residents expressed their concern about their civil rights being violated with the removal of these various things, Defendants "merely just shrug it off and tell the clients 'it's none of your concern'" and they have not taken any action to prevent further removal of furniture and things.  (*Id.* ¶¶ 69– 70.)

Fifth, Plaintiff alleges that Defendants have denied him and other residents' meals as a form of punishment without due process, and that they have not taken any actions to prevent this from happening again.  (*Id.* ¶¶ 72, 74–75.)  Plaintiff asserts that he was denied breakfast on several occasions when he was on "RS 4 Restriction," which required him to have his meals in his room, and that he was not provided lunch on one occasion after being transferred from DOC (the transfer took place from approximately 10:30am to 1:00pm).  (*Id.* ¶¶ 72–73.)

Sixth, Plaintiff alleges that on June 7, 2011, staff, with the knowledge of Defendants and without due process, refused another resident his right to attend a religious service.  (*Id.* ¶¶ 76–78.)  Plaintiff apparently inquired as to why and was told that "it was none of his concern."  (*Id.* ¶ 76.)

Seventh, Plaintiff alleges that Defendants have a policy to house him and other MSOP residents who have filed § 1983 actions against MSOP separately from other MSOP residents who have not filed such actions, and that they have done so without providing them due process.  (Am. Compl. ¶¶ 80–81, 84.)  Plaintiff asserts that this policy keeps the two types of residents from speaking to

one another.  (*Id.* ¶ 81.)  Plaintiff also alleges that Defendants have a policy that allows them to punish residents who share legal papers with others.  (*Id.*)  He claims that MSOP staff has treated him and others who have filed actions "more harshly and punitively" because Defendants have created an atmosphere whereby Plaintiff and others housed in the same unit are considered "trouble makers" and "management problems."  (*Id.* ¶ 82.)  Specifically, he claims that residents housed in his unit are more restricted in their movement, more restricted in their access to things such as a microwave or a hot pot, and more restricted in their ability to speak to other residents when passing by.  (*Id.* ¶ 83.)

Eighth, Plaintiff alleges that Defendants have denied him treatment by their refusal to allow him entry to group therapy sessions.  (*Id.* ¶ 85.)  He claims that their refusal is being done in retaliation for his bringing this action against them, and it is in violation of the court ordered treatment that Plaintiff was to be provided.  (*Id.* ¶¶ 86–87.)

And finally, Plaintiff alleges that Defendants have imposed several restrictive conditions on his confinement that are punitive in nature and amount to constitutional violations.  (*Id.* ¶ 79.)  Generally, Plaintiff asserts that the number of residents in MSOP has grown from 170 to approximately 600 people over the time he has been there and that such growth has resulted in overcrowding. He asserts that because of the overcrowding he has been forced to be double bunked with a "highly dangerous sex offender who ha[s] no sexual impulse control and [is] highly likely to re-offend."  (*Id.* ¶ 88.)  He asserts that other

residents have already been sexually assaulted by their roommates. (*Id.*) Such overcrowding has also allegedly resulted in Plaintiff being limited in his exercise and being forced to eat in the recreation center. (*Id.*) When residents complain about such conditions, he asserts that staff says "we just do as we're told, don't blame us." (*Id.*)

Plaintiff also alleges that the policies, procedures, and practices imposed by defendants have been excessively restrictive and arbitrarily enforced. (*Id.* ¶ 90.) He asserts that "[a]ll policies, procedures and practices concerning any of the operations of MSOP, treatment to the residents, the conditions of their confinement, or the right and privileges to which they are entitled, are developed, adopted, and approved by the 'clinical team,'" which includes all of the named Defendants. (*Id.* ¶ 89.) He also asserts that all actions taken against him have been done with the knowledge and consent of the clinical team. (*Id.*) Specifically, Plaintiff lists forty-seven policies, procedures, and practices as examples of those that allegedly are excessively restrictive, including the policy and practice of strip-searching him after visitation; the policy and practice of denying him access to hot water for tea, coffee, or soup; the policy and practice of denying him educational programming; the policy and practice of monitoring him during religious services or when speaking with clergy or other religious volunteers; the policy and practice of denying him access to hobbies; the policy and practice of denying him the right to have his television set send to him by his parents; the policy and practice of limiting telephone calls to his lawyers; the

14

policy and practice of doing security checks every half hour; the policy and

practice of taking away the basic life skills of allowing client to manage their

personal financial affairs; the policy and practice of taking away the right to drug

and alcohol treatment; and the policy and practice of denying him the right to

share food with others. (*Id.* ¶ 91.) Thereafter, Plaintiff more specifically calls out

certain policies or practices and provides further allegations as follows.

Regarding "Delay and Loss of Mail Correspondence," Plaintiff alleges that

Defendants are responsible for ensuring that his mail is properly delivered to him

and that his outgoing mail is properly delivered to the U.S. Post Office. (*Id.* ¶ 93.)

Plaintiff claims that it was not until recently that Defendants established policies,

procedures or directives that would ensure timely delivery. (*Id.*) Now, outgoing

mail is to be delivered to a locked mailbox on the unit and is picked up daily and

delivered to the U.S. Post Office, and incoming mail is to be handed out to

residents certain times each day. (*Id.* ¶¶ 94–95.) Plaintiff asserts that because

of the prior confusion and inconsistency, it "undoubtedly resulted in the loss and

failure to deliver some of his mail." (*Id.* ¶ 93.)

Regarding "Delay and Denial of Packages," Plaintiff alleges that on one

occasion he was forced to return a television he purchased because it did not

come from an approved vendor, even though it passed all other security policies.

(*Id.* ¶ 96.) And on another occasion he had to wait six days before receiving

childhood photos of himself that were sent to him from his mother. (*Id.* ¶ 97.)

Plaintiff also had to wait over a month before he was allowed his family photo

album that he brought with him from prison.  (*Id.* ¶ 98.)  In addition, Plaintiff alleges that he had to wait almost two weeks to receive six books from the public library that were on loan for twenty-four days, and that Defendant Lundquist told him that they were "going as fast as they could."  (*Id.* ¶ 99.)

Regarding "Denial and Censorship of Publication," Plaintiff alleges that Defendants originally had a policy to deny him and others access to magazines and newspapers.  (*Id.* ¶ 101.)  Now Defendants remove certain pages and sections of the newspaper before it is provided to Plaintiff, and they do not allow Plaintiff and other MSOP residents to share the newspaper.  (*Id.* ¶¶ 101–02.)  Plaintiff claims that his newspaper has been censored on numerous occasions and that he has since learned that on several occasions the parts of the newspaper that were removed included articles about the Minnesota Sex Offender Program, the sexual predator statute, or someone who was to be committed under the program.  (*Id.* ¶ 102.)

Regarding "Excessive Visitation Restrictions," Plaintiff alleges that visitors who want to visit him have to fill out a visitor form that is the same form used by the DOC; he is strip searched after visitations; during visitations he is not permitted to sit next to or have contact with his visitors; the list of persons who are permitted to visit him is severely limited; the days, time, frequency, and durations of visits are severely limited (visitation is restricted to Saturdays, Sundays, and holidays from 1:00pm to 4:30pm); he is not allowed to use the bathroom during visits; he is not permitted to hold hands with his visitors; he is

16

not permitted to sit side-by-side with his visitors; he may only briefly kiss or hug

his visitor at the door at the start of visitation; he must stay seated at all times; he

must sit facing a staff person at all times; neither he nor his visitor may smoke

during visitation; no area outdoors on the grounds is made available for visitation;

he cannot have hot coffee or tea during visitation; and while he is living in Unit

Omega, he is not allowed contact visits. (*Id.* ¶¶ 106–07.)  In addition, Plaintiff

alleges that Defendants have on several occasions arbitrarily denied him

visitation privileges with his family and friends. (*Id.* ¶ 105.)  He claims that he has

complained about these restrictive policies to Defendants and they have refused

to justify or change the policies. (*Id.* ¶ 108.)

Regarding "Unnecessary Restraint and Arbitrary Placement in Isolation

Cells," Plaintiff alleges that Defendants have a policy to handcuff and shackle

Plaintiff during transports to and from visits to the dentist or other medical care

providers outside the facility. (*Id.* ¶ 109.)  And he alleges that he is strip-

searched whenever he is placed in an isolation cell. (*Id.*)  On one occasion,

Plaintiff alleges that he was handcuffed and shackled, placed in a cell with a

camera and no running water, and when he refused to be strip-searched, staff

came in and attempted to rip his clothing off him. (*Id.* ¶ 110.)  And for the

clothing that could not be ripped off, they cut it off him while he was still in

handcuffs. (*Id.*)  On another occasion, Plaintiff alleges that he was strip-searched

when leaving the DOC, and then strip-searched again when he was admitted into

MSOP, even though he had never been out of MSOP staff supervision and had

17

been restrained with ankle, wrist, and waist chains.  (*Id.* ¶ 111.)

Plaintiff also alleges that Defendants have taken part in certain retaliatory acts against him.  He acknowledges that he has emotional management problems and that he sometimes has emotional outbursts; but he claims that when he gets upset, staff will just write up a Behavior Expectation Report on him rather than talk to him to figure out why he is upset.  (*Id.* ¶ 112.)  He alleges that staff has removed items from his room without filing a "secured items list," and for some items listed as secured items, they have misplaced them or forced him to wait months to reclaim approved items.  (*Id.* ¶ 113.)  Plaintiff also alleges that staff has refused to allow him breaks when he is on restrictive status (i.e., allowing him less than an hour a day out of his room).  (*Id.* ¶ 114.)  In addition, Plaintiff alleges that Defendants have refused him his right to call legal aid, stating that a policy requires that he needs a name with a number in order to call, not just a number.  (*Id.* ¶ 115.)

Next, Plaintiff alleges that he has been denied meaningful access to libraries.  (*Id.* ¶ 118.)  He claims that Defendants did not permit him library access for months due to his restrictive status, and that residents in Unit Omega are only allowed thirty minutes in the library while other units are allowed more time.  (*Id.* ¶ 119.)  He is also only allowed one hour a day on the unit computer.  (*Id.* ¶ 121.)  Plaintiff asserts that MSOP does not have its own law library, but when he has been granted access to a DOC library, staff has told him that he is not entitled to access anything there because MSOP is not a prison.  (*Id.* ¶ 122.)  Plaintiff

18

asserts that the schedule Defendants have provided for access to the law library was erratic and sometimes cancelled because of overcrowding. (*Id.* ¶ 123.) And he asserts that the legal materials available at the law library are inadequate, not kept current, and no librarian or other staff person is available to assist residents who use the law library. (*Id.* ¶ 126.) Plaintiff alleges that he was permitted much more access to a law library when he was in prison compared to what he is allowed at MSOP. (*Id.* ¶ 124.) He also asserts that while in prison he was not escorted there nor had security watching over him, and in prison a law library clerk was available to help answer questions, which is not the case at MSOP. (*Id.*)

Regarding "Unreasonable Strip Searches," Plaintiff alleges that Defendants have developed a policy to strip search him after any visitation by two MSOP staff, even though Plaintiff is observed for the entirety of his visits and subjected to other restrictive regulations during visitation. (*Id.* ¶¶ 127–28.) The policy requires the staff to stand and watch Plaintiff undress, to have Plaintiff hand his clothes to staff so they can check the clothing, and then have the staff watch Plaintiff dress. (*Id.*) No strip searches are required after attorney visits or after visits with religious volunteers. (*Id.* ¶ 128.) But strip searches are required before and after transport for medical visits. (*Id.* ¶ 130.) Plaintiff alleges that he has been forced to be strip-searched when taken to a higher security area, even though he had not been off his unit. (*Id.* ¶ 131.) He alleges that if he refuses, staff will place him in wrist and ankle restrains until he decides to strip or they will

cut his clothing off.  (*Id.*)  Plaintiff asserts that Defendants know of this policy and have failed or refused to stop it.  (*Id.* ¶ 132.)

Regarding what Plaintiff calls "Other Unreasonable Searches and Shakedown," Plaintiff alleges that Defendants have on several occasions searched his room and his personal belongings without a warrant, notice, reasonable suspicion, or consent, and that Plaintiff has not been allowed to watch any of these "shakedowns."  (*Id.* ¶¶ 134, 136.)  On one occasion, he alleges that his cell was "shaken down" upon direction from Defendant Ninneman because of a "sticker" on Plaintiff's ID.  (*Id.* ¶ 135.)

Regarding "Denial of Meal," Plaintiff alleges that he has complained to Defendants numerous times that his meals have not been served to him, only to hear that "it's too late."  (*Id.* ¶ 137.)  And Defendants have also refused him hot water to make tea or soup, stating that the hot water could be used against staff. (*Id.* ¶ 138.)  Plaintiff also alleges that Defendants have denied and/or severely restricted his ability to possess personal property.  (*Id.* ¶ 139.)  Specifically, Plaintiff alleges that Defendants have denied him and others that live on Unit Omega the right to have a computer in his room, a game system, a 19-inch television sent to him from www.BrandmartUSA.com, a DVD player, DVDs, and a hotpot.  (*Id.* ¶¶ 140–45.)

Regarding "Monitoring Telephone Calls," Plaintiff asserts that he believes that all of the telephone lines used by MSOP residents are monitored through the use of the control booth and the overhead speaker system at the direction of

Defendants, and that he has complained to Defendants about the monitoring but they have failed or refused to stop it. (*Id.* ¶¶ 146, 148, 152.) He alleges that the telephone that is available for residents is next to the entrance and the staff office, and therefore it offers no privacy in which to conduct personal or legal phone calls. (*Id.* ¶¶ 147, 149.) He asserts that MSOP has the facilities to offer residents a quiet, unmonitored, private area for telephone calls, but Defendants have rarely allowed Plaintiff to use them. (*Id.* ¶ 150.) On one occasion, he asserts that he was forced, according to policy, to have the phone on speaker mode with staff present during a legal hearing. (*Id.* ¶ 151.)

Regarding "Denial of Recreational Activities and Exercise" and "Denial of the Use of Yards," Plaintiff alleges that when he returned to MSOP Defendants "failed to make any recreation equipment available to him," "would not allow [him] the use of either the big yard or small yard for exercise or fresh air," and that they "provided nothing for the residents to do in terms of recreational or exercise activities." (*Id.* ¶¶ 155, 159.) He also alleges that since he has lived on Unit Omega, Defendants have denied him any recreation activities, including not allowing him to go to the gym or the yard, for months at a time. (*Id.* ¶ 157.) He alleges that when Defendants ultimately allowed him to participate in recreation activities and exercise, he was forced to fill out a "therapeutic recreational form," the room was small, and there was not enough equipment for the MSOP residents. (*Id.* ¶ 156.) He also states that Defendants would allow him access to the "courtyard," which is a small concrete space enclosed within the buildings

21

and a fence.  (*Id.* ¶ 159.)  Plaintiff alleges that MSOP has control over the "small yard," and the "big yard" is shared with the general population.  (*Id.* ¶ 160.) Plaintiff alleges that he was told by staff that a policy developed by Defendant Benson prohibited residents like him from using the outside yards because if he were to attempt to jump the two ten-foot high fences, MSOP staff, who provide perimeter security around the yard, could not shoot him.  (*Id.*)  When Plaintiff completes his "restriction status," he asserts that Defendants will allow him access to a small yard for only one hour a day; DOC inmates at Moose Lake apparently are allowed to use their big yard for up to six hours a day, and they allegedly have less staff on duty than the MSOP.  (*Id.* ¶¶ 161–62.)

Plaintiff also alleges that Defendants have failed or refused to provide him access to any hobby activities.  (*Id.* ¶ 165.)  Specifically, he alleges that while he has been living on Unit Omega, no hobby or craft items have been allowed; he is allowed only color pencils or pastels, but is not allowed paint brushes, a canvas, a guitar, or other "basic needs for hobby and craft."  (*Id.* ¶ 166.)  He asserts that Defendant Benson has stated that "paper and pencils are enough hobbies for the MSOP residents."  (*Id.* ¶ 165.)

Next, Plaintiff alleges that Defendants have failed to provide him with adequate or timely medical care and that on several occasions they have refused him access to medical treatment.  (*Id.* ¶ 168.)  Specifically, he asserts that Defendants have established a policy that any time he requests aspirin or other nonprescription over-the-counter treatments he must have the approval of a

22

physician's assistant at MSOP before he can receive them.  (*Id.* ¶ 169.)  He asserts that frequently, because of under-staffing, there is no physician's assistant on duty, and therefore he has had to go without treatment.  (*Id.*)  On one occasion, Plaintiff alleges that his mouth started to bleed after he had had a tooth pulled the day before.  When he asked for a nurse to bring him something to stop the bleeding, he waited for hours for a response, at which time the bleeding had stopped.  (*Id.* ¶ 170.)  Plaintiff also alleges that Defendants have established a policy that requires staff to be present in the examination room with Plaintiff when he is being examined by a doctor, which both embarrasses him and discourages him from seeking medical assistance on occasion.  (*Id.* ¶ 172.)  In addition, as long as Plaintiff is residing in Unit Omega, he is subject to pat searches when returning after medical exams.  (*Id.* ¶ 171.)

Plaintiff also alleges that Defendants have denied him access and opportunities to other things as well.  He asserts that MSOP residents can purchase goods from a prison store located at the Minnesota DOC facility in Oak Park Heights, but Defendants have developed a policy that "severely restricts the items" that Plaintiff may purchase through this system.  (*Id.* ¶ 173.)  In addition, Plaintiff alleges that he was denied his order in May 2011 due to insufficient funds in his account, even though he had asked before he made the purchase what amount he had in his account.  (*Id.*)  In this instance, he claims he was required to wait a week before his request was replied to.  (*Id.*)  Plaintiff also asserts that Defendants have not created an inmate account system like the

23

DOC, and that when residents overdraw on their accounts, Defendants use it against them before the Special Review Board to justify indefinite commitment. (*Id.*)

In addition, Plaintiff alleges that Defendants have denied him both educational and employment opportunities. Specifically, Plaintiff asserts that he has a G.E.D. and that he has inquired about taking correspondence courses, but Defendants have told him that MSOP "will not allow it." (*Id.* ¶ 175.) Plaintiff asserts that the DOC institutions in the area have contracted with a local community college to provide qualified and consistent educational programming and services, but that Defendants have not made such arrangements for the residents of MSOP. (*Id.* ¶ 177.) In addition, Defendant Benson allegedly will not permit MSOP residents to attend programs or make rooms available for educational programming for MSOP residents the way DOC inmates are allowed (Plaintiff asserts DOC inmates are allowed educational services every evening during the week). (*Id.*) Regarding employment, Plaintiff alleges that when he was first detained at MSOP he was given some reasonable employment opportunities, but since his latest return from DOC, and since former DOC administrators have taken over the facilities, he has not. (*Id.* ¶ 179.) He asserts that he has specifically asked if he could stuff envelopes for employment, but was denied and told by Defendants that unless he does "Free work (work for at least 2 hrs a week)" he will not be given any employment opportunities. (*Id.* ¶¶ 180–81.) In addition, Defendants allegedly have imposed a new policy that allows the

24

MSOP to take half of the pay of those who do work. (*Id.* ¶ 182.) He contends that such policies violate fair labor law and reflect slave labor. (*Id.* ¶ 181.) He also asserts that "without the opportunity to engage in meaningful employment, his hopes of ever being release[d] are doubtful," and that "[m]eaningful employment and educational opportunities[] provide job skills for release, [and] are critical to making any treatment program effective." (*Id.* ¶ 183.)

Finally, Plaintiff alleges that Defendants have "used religious service as a privilege." (*Id.* ¶ 184.) He asserts that Defendants have denied other residents the right to attend service, and that they have specifically denied him his right to celebrate with food with others. (*Id.* ¶¶ 184, 186.) He allegedly was told by Defendants that he was only allowed a feast once a year, even though he and other clients were willing to pay for the food for the feasts. (*Id.* ¶ 186.)

In Plaintiff's Amended Complaint, he also titles a section "Equal Protection Claim & State Created Liberty Interest," which appears to assert a claim for violation of § 1985. (*See* Am. Compl. ¶ 188.) Therein, he alleges that Defendants have an unconstitutional policy to "attack and provoke mental and emotional outbursts" from Plaintiff. (*Id.* ¶ 187.) He contends that because the policy requires MSOP employees to keep "Program notes" that "include factors that justify need for continued stay," and because Defendants are "arbitrarily placing patients in a 'Tactics' group, to deny patients completion of the program," it is evidence that Defendants are conspiring against Plaintiff's right to receive rehabilitation and are "circumventing treatment completion." (*Id.* ¶¶ 187, 189.)

25

Plaintiff references "the audit report submitted to the Minnesota legislature" in support as well.  (*Id.* ¶ 187.)  Plaintiff also asserts that Defendants are in violation of "42 USC § 200a. Prohibition against discrimination to redress the deprivation of service, Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq., and Rehabilitation Act of 1973, § 504(a), as amended, 29 U.S.C.A. § 794(a)."  (Am. Compl. ¶ 188.)

        In addition, Plaintiff's Amended Complaint contains a section titled "Minnesota Human Rights Act violation M.S. §363A."  There Plaintiff alleges that because his liberty interest in treatment is being violated, he is also being denied the opportunity to transition into a community based program in violation of the Minnesota Human Rights Act.  (Am. Compl. ¶ 190.)  He asserts that the court's civil commitment order required that he "be placed in the MSOP program, and is to complete the program," but that the "Attorney Genera[l]'s Office is oppressing plaintiff from being able to reduce his predatory risk level assessment and violat[ing] plaintiff's right to receive adequate treatment that will give the plaintiff an opportunity for release."  (*Id.* ¶¶ 192–93.)  He alleges that Defendants are acting under color of law, are conspiring to deprive him of his rights to reduce his severity risk level of "highly dangerous" as other prisoners in the DOC are allowed to do, and have arbitrary prison policies that deprive Plaintiff of his right to due process.  (*Id.* ¶ 194.)  He also states generally that "[t]he unlawful civil commitment, deliberate indifference to medical needs, unsafe conditions, sexual abuse, racial harassment and retaliations violates plaintiff's rights and

constitutes, cruel and unusual punishment, due process violations, denial of

rehabilitation and equal protections of law, under the First, Fourth, Fifth, Sixth,

Eighth, Ninth and Fourteenth Amendment to the United States Constitution."

(Am. Compl. ¶ 195.)

Plaintiff's final factual section in his Amended Complaint titled "Negligent

hiring and Credentialing of MSOP Staff" alleges that through the 2011 legislative

audit report, Defendants have admitted that they have been negligent in hiring

and credentialing MSOP staff and that they agree this violates Plaintiff's civil and

constitutional right to be treated and released.  (*Id.* ¶ 196.)  Ultimately, Plaintiff

seeks both declarative and injunctive relief, as well as compensatory and punitive

damages.  (Am. Compl., Prayer at 59–60.)

Defendants jointly move to dismiss on the grounds that the Complaint fails

to state claims upon which relief can be granted pursuant to Fed. R. Civ. P.

12(b)(6).  Specifically, Defendants assert that the Plaintiff failed to state

actionable claims on each of his allegations because of insufficient facts to

support the allegations, because they are *de minimis* injuries for which  the

constitution  is  not  concerned,  or  are  not  actionable  as  a  matter  of  law.  In

addition, Defendants contend that they are entitled to immunity under the

Eleventh Amendment.

## DISCUSSION

## I.    Standard of Review

In deciding a motion to dismiss for failure to state a claim upon which relief

27

can be granted under Rule 12(b)(6)[2] of the Federal Rules of Civil Procedure, the

Court must accept as true all factual allegations in the complaint and view them

in the light most favorable to the Plaintiff. *Schaller Tel. Co. v. Golden Sky Sys.,*

*Inc.*, 298 F.3d 736, 740 (8th Cir. 2002). In doing so, however, a court need not

accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview*

*Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the

pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488

(8th Cir. 1990). A court may consider the complaint, matters of public record,

orders, materials embraced by the complaint, and exhibits attached to the

complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal

Rules of Civil Procedure. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079

(8th Cir. 1999) (stating that the court "may consider some materials that are part

of the public record or do not contradict the complaint" (quotations omitted)).

---

[2]    Although Defendants do not assert that they are bringing their motion
under Rule 12(b)(1), they do argue that the Court does not have subject matter
jurisdiction to consider Plaintiff's claims for damages against Defendants for
actions taken in their official capacities based on Eleventh Amendment immunity.
Dismissal pursuant to Rule 12(b)(1) is proper where an attack on the complaint's
alleged basis for subject matter jurisdiction reveals that there is no actual basis
for jurisdiction. *Wheeler v. St. Louis Sw. Ry. Co.*, 90 F.3d 327, 329 (8th Cir.
1996). On a motion to dismiss under Rule 12(b)(1), a defendant may challenge
the plaintiff's complaint either on its face or on the factual truthfulness of its
averments. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v.
United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a facial challenge to
jurisdiction, such as the one before this Court in regard to Defendants' Eleventh
Amendment immunity argument, review is restricted to the pleadings and affords
the non-moving party the same protections that it would receive under a Rule
12(b)(6) motion to dismiss. *See Osborn*, 918 F.2d at 729 n.6.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. Whether a complaint states a claim is a question of law. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). In addition, this Court notes that *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). However, even a *pro se* complaint must allege facts, and not just bare, unsupported, legal conclusions. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) ("Although it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions.").

To successfully plead a § 1983 civil rights cause of action, a complainant must allege a set of historical facts, which, if proven true, would demonstrate that the named defendant(s) violated the complainant's federal constitutional rights while acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Furthermore, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights" protected by the Constitution.

*Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *Speed v. Ramsey County*, 954 F. Supp. 1392, 1397 (D. Minn. 1997) (same).  In other words, civil-rights claimants must plead facts showing each defendant's *personal* involvement in alleged constitutional wrongdoing.  *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999); *see also Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (holding that plaintiff "failed to allege sufficient personal involvement by any of defendants to support such a claim").  In sum, when a plaintiff seeks relief under § 1983, his complaint must set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, while acting under color of state law, which purportedly violated the plaintiff's federal constitutional rights.

## II.   Standing

A party invoking federal jurisdiction bears the burden of establishing the elements of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To have standing, a plaintiff must demonstrate: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision.  *Id.* at 560–61.

Some of Plaintiff's allegations in the Amended Complaint do not allege injuries to Plaintiff himself, but to other residents of MSOP.  For example, Paragraph 60 alleges unconstitutional denial of the use of the yard and gym by other residents (in addition to Plaintiff); Paragraphs 76–78, and 184 describe the refusal by staff of other people's right to attend religious service; Paragraphs 81–

30

84 refer to a separation policy and other restrictions as applied to other MSOP residents who have filed lawsuits (in addition to Plaintiff); Paragraph 88 refers to other MSOP residents who allegedly have been sexually assaulted by their roommates; Paragraphs 101–04 alleges unconstitutional denial and censorship of other MSOP residents' (in addition to Plaintiff) magazines or newspapers; Paragraphs 118–19 alleges unconstitutional limits on access to a library of other MSOP residents (in addition to Plaintiff); Paragraph 145 alleges that Defendants have denied other residents (in addition to Plaintiff) the right to any game system, DVD player, DVDs, and a hotpot; Paragraphs 146–50 refers to the monitoring of MSOP residents' (including Plaintiff's) telephone calls by staff; Paragraphs 155–156 concern the denial of recreational activities and exercise to MSOP residents (including Plaintiff); Paragraphs 162–63 references restrictions on MSOP residents' use of the big yard; Paragraph 172 refers to how a medical care policy requiring staff to be present in the examination room affects MSOP residents; and Paragraphs 176–77 describes how Defendants have refused to provide sufficient resources and educational services to MSOP residents.

Plaintiff has failed to satisfy the injury in fact requirement with respect to those allegations that involve other MSOP residents. And because Plaintiff has therefore failed to establish the elements of standing for those claims, this Court has no jurisdiction over them. This Court thus recommends that those claims made on behalf of other MSOP residents be dismissed with prejudice.

III.    **Immunity under the Eleventh Amendment**

Apparent from Plaintiff's Amended Complaint, Plaintiff has sued

Defendants in both their individual and official capacities.  Defendants

acknowledge that the Eleventh Amendment does not bar Plaintiff's claims against

Defendants for declaratory and injunctive relief.  (Doc. No. 17, Defs.' Mem. of

Law in Supp. of Their Mot. to Dismiss Pl.'s Compl. ("Defs.' Mem.") 9 n.2.)  But

they do argue that pursuant to the Eleventh Amendment, the Court lacks subject

matter jurisdiction to consider any claims for damages against them for actions

taken in their official capacities.  (Defs.' Mem. 9.)  Defendants are correct.

The Eleventh Amendment grants a state immunity from suits brought in

federal court by its own citizens, as well as citizens of another state.  U.S. Const.

Amend. XI (stating that the "judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted

against one of the United States by Citizens of another state"); *Edelman v.*

*Jordan*, 415 U.S. 651, 662–63 (1974); *Alsbrook v. City of Maumelle*, 184 F.3d

999, 1005 (8th Cir. 1999).  Therefore, under the Eleventh Amendment, federal

courts do not have subject matter jurisdiction over a claim against a state for

damages when that state has not consented to the suit.  *See Seminole Tribe of*

*Florida v. Florida*, 517 U.S. 44, 64–65 (1996); *Roberts v. Dillon*, 15 F.3d 113, 115

(8th Cir. 1994).  And when a claim is barred by the Eleventh Amendment, the

claim must be dismissed for lack of subject matter jurisdiction.  *Seminole Tribe*,

517 U.S. at 64–65, 72–73.  A state, however, can waive its Eleventh Amendment

immunity. *Alsbrook*, 184 F.3d at 1005. A suit against a government official in his

or her official capacity is considered a suit against the entity of which the officer is

an agent. *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007). This is because

"the real party in interest in an official capacity suit is the governmental entity and

not the named official." *Id.* (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

In Plaintiff's Amended Complaint, in a section titled "Award Damages,"

Plaintiff states in part:

> 1) Award Compensatory damages in an amount of Two Million
> (2,000,000) against each diffent [sic], or in such other amount as the
> jury may determined [sic] according to proof by Plaintiff against all
> defendats [sic] in their individual capacities;
>
> 2) Award Punitive damages in the amount of Two Million
> (2,000,000) ag[ai]nst each diffenent [sic], or in such other amount as
> the jury may determine is sufficient to punish him and deter others
> from committing the constitutional violations alleged in this
> complain[t][.]

(Doc. No. 9, Am. Compl. at 59.) Although it appears that Plaintiff is alleging

damages only against Defendants in their individual capacities (which is entirely

proper – *see Nix v. Norman*, 879 F.2d 429, 433 n.3 (8th Cir. 1989)), based on

paragraph two in the "Award Damages" section and on Plaintiff's response to the

motion to dismiss, it is not altogether clear. (*See* Doc. No. 22, Pl.'s Mot in Opp'n

of Defs.' Mot. to Dismiss 5–10.) What is clear is that Plaintiff's Amended

Complaint alleges violations of 42 U.S.C. § 1983 – the federal civil rights statute

that allows citizens to seek relief for alleged violations of their federal

constitutional rights. And the State of Minnesota has not waived its immunity and

33

consented to be sued in this case.  It is well-settled that in a § 1983 action such as this, the Eleventh Amendment precludes an award of money damages against a state official acting in his or her official capacity.  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66–67 (1989); *Edelman*, 415 U.S. at 662–63; *Larson v. Kempker*, 414 F.3d 936, 939 n.3 (8th Cir. 2005).  Accordingly, to the extent Plaintiff's claims for damages are asserted against Defendants for actions taken in their official capacities, those claims should be dismissed with prejudice and this portion of Defendants' motion should be granted.

## IV.    Plaintiff's Constitutional Claims

Plaintiff asserts that Defendants have violated his constitutional rights in violation of 42 U.S.C. § 1983, which prohibits a person acting under color of state law from depriving another person of his or her "rights, privileges, or immunities secured by the Constitution and laws."  Section 1983 is not itself "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Throughout Plaintiff's sixty-one-page Amended Complaint, he alleges violations of his First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendment rights under the U.S. Constitution, and he categorizes his claims into thirteen causes of action.  This Court addresses below whether Plaintiff has stated claims for which relief may be granted.

### A.    Fourteenth Amendment – Failure to Provide Treatment Claim

### (i)    Background: Minnesota Sex Offender Civil Commitment Law

Before turning to the constitutional basis for a right to adequate treatment, a brief review of the history of Minnesota's law for the civil confinement of sex offenders is necessary.[3]  In 1939, Minnesota became the third state to adopt a sexual predator civil commitment law, with the enactment of the "psychopathic personality" ("PP") commitment statute, now codified as Minn. Stat. § 526.10. Also in 1939, the Minnesota Supreme Court in *State ex rel. Pearson v. Probate Court*, upheld the constitutionality of the law but narrowed its scope to apply only to "those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the object of their uncontrolled and uncontrollable desire."  287 N.W. 297, 302 (1939), *aff'd*, 309 U.S. 270 (1940).  During the next fifty years, the PP law was used primarily as an alternative to criminal punishment; persons were committed under the PP law rather than being criminally charged and convicted.  And persons who were civilly committed because of their "psychopathic personality" were confined at the State Security Hospital and were provided psychiatric treatment.

---

[3]    This history is drawn from the following law review article:  John Kirwin, *One Arrow in the Quiver – Using Civil Commitment As One Component of a State Response to Sexual Violence*, 29 Wm. Mitchell L. Rev. 1135 (2003).

By 1970, civil commitment under this law had dramatically decreased –
only thirteen persons were committed in the 1970's and just fourteen in the
1980's.  Between 1987 and 1991, however, there were a series of horrific
rape/murders committed by sex offenders recently released from state prisons in
Minnesota, and the Minnesota Attorney General convened a task force on the
prevention of sexual violence against women that recommended stiffer criminal
sentences for dangerous sex offenders and increased use of PP commitment to
confine and treat the most dangerous offenders being released from prison.  In
1989, the Minnesota Legislature followed up by enacting several provisions to
help assure that highly dangerous sex offenders would not be released
prematurely from prison.  In addition to enacting tougher criminal sentences, the
Legislature required a court sentencing a sex offender to make a preliminary
determination of whether a PP commitment may be appropriate and to refer any
such cases to the county attorney.  Then, in 1992, the Legislature enacted a
screening process to evaluate all high risk sex offenders before release from
prison.  As a result, PP commitments increased from two in 1990 to ten in 1991,
and twenty-two in 1992.  In contrast to earlier PP commitments that typically
involved first-time offenders who were civilly committed as an alternative to
criminal punishment, those persons committed during the early 1990's were
repeat sex offenders who either had failed or refused to participate in sex-
offender treatment in prison.  And this is how the sex offender civil commitment
law has been utilized in the last twenty years; it has been used to confine a class

36

of sex offenders after their prison sentences have been served.

As commitments under the PP law of convicted sex offenders who were finishing their prison terms increased, however, so did the challenges to these commitments. In 1994, three convicted sex offenders, including Dennis Lennihan, successfully challenged their commitments under the PP law. *See In re Linehan*, 518 N.W.2d 609, 614 (Minn. 1994). The problem was that the PP law, as narrowed by the Minnesota Supreme Court in *Pearson*, required that the person must "have evidenced an utter lack of power to control their sexual impulses." *Id.* at 613–14. But the evidence that the convicted sex offender *had planned* their sexual misconduct, evidence that may have been important in procuring a prior sex offense criminal conviction, was inconsistent with the utter lack of power to control. In addition, the court started to question whether non-violent sexual conduct posed a sufficient level of harm to victims to warrant commitment under the PP statute. As a result, a legislative task force in 1994—after the Attorney General and several county attorneys told the task force that the appellate courts in these cases may have significantly decreased the usefulness of the PP statute to protect the public from sexual predators—proposed a set of statutory amendments relating to the civil commitment of sexual predators.

In August 1994, the Minnesota Legislature met in special session and enacted the statutory amendments that added a new commitment category of "sexually dangerous person" ("SDP") to the Minnesota Civil Commitment Act,

Minn. Stat. § 253B.02, subd. 18c(a).  The new commitment category contained

the same three basic elements that existed in the PP law, i.e., (1) a history of

harmful sexual conduct, (2) a mental dysfunction, and (3) resulting likelihood of

future harmful sexual conduct.  *Id.*  However, the SDP commitment standard

made two important changes.  In response to the first *Linnehan* decision (*In re

Linehan*, 518 N.W.2d 609 (Minn. 1994)), the new statute defined the dysfunction

differently.  The new SDP law required the person to have a "mental disorder or

dysfunction," and sexual and personality disorders were two types of mental

disorders that may be included.  The new statute made it clear that this definition

of disorder, not the "utter lack of power to control" standard from the 1940

*Pearson* case, applied.  *See* Minn. Stat. § 253B.02, subd. 18c(b) ("For purposes

of this provision, it is not necessary to prove that the person has an inability to

control the person's sexual impulses.").  In addition, the new statute created a

rebuttable presumption that conduct violating criminal statutes would be

sufficiently harmful to support civil commitment.  *Id.* § 253B.02, subd. 7a(b).

The PP law was retained, but it was renamed "Sexual Psychopathic

Personality" ("SPP"), and it was moved from the probate statutes to the

Minnesota Civil Commitment Act, Minnesota Statute Ch. 253B.  The SPP law

was retained because it was certain that there would be a constitutional

challenge to the new SDP law.  Since 1994, county attorneys have sought and

obtained commitments under both the SPP and SDP laws in most cases.

The Minnesota Sex Offender Program ("MSOP"), which has facilities in

38

Moose Lake and St. Peter, was established in 1994.  Since 1994, when the SDP law was passed, the total number of civilly committed sex offenders in MSOP has grown significantly.  In 1990, there were fewer than thirty civilly committed sex offenders in Minnesota, by 2000 there were 149, by mid-2010 there were 575 sex offenders in MSOP, and the state projects that the number of civilly committed sex offenders will grow to 1,215 by 2022.  Off. of the Legis. Auditor, State of Minn., Evaluation Report: Civil Commitment of Sex Offenders (2011) ("2011 Auditor's Report").[4]  After 2003, when a sex offender who was not civilly committed after his release from prison committed a rape and murder, the Minnesota Department of Corrections began referring all imprisoned offenders who might meet the legal standard for commitment to the county attorneys for possible commitment proceedings.  With that change in policy, the number of annual DOC referrals for civil commitment grew to about six times the rate prior to 2003, ultimately resulting in a large increase in sex offender civil commitments.  By 2010, Minnesota had the third highest population of civilly committed sex offenders—after California and Florida—and had the highest number in the nation on a per capita basis.  This rapid growth in the number of confined sex offenders is due at least in part to the fact that no civilly committed sex offender has ever been discharged from MSOP since the program began in 1994.

---

[4]    Available at http://www.auditor.leg.state.mn.us/ped/pedrep/ccso.pdf (last visited January 11, 2012).

### (ii)   Constitutional Right

Before determining whether Plaintiff's allegations about the adequacy of his mental health treatment at MSOP state plausible claims for relief, it is necessary to review the development of the law regarding the constitutional right of persons civilly committed because of their sex offender status to such treatment, because there is a threshold issue of whether the detained sex offender has any right to treatment at all.  The constitutional basis for mental health treatment claims is the Fourteenth Amendment's Due Process Clause[5]

---

[5]    Plaintiff asserts violations of both the Fifth and the Fourteenth Amendments to the United States Constitution.  The Fifth Amendment's Due Process Clause, which provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," only applies to limit federal government actions, and so is not applicable to limit the state government actions that Plaintiff challenges here.  *See Barron v. City of Baltimore*, 32 U.S. 243, 247 (1833) ("[T]he fifth amendment must be understood as restraining the power of the general government, not as applicable to the states."); *see also Junior Chamber of Commerce of Kansas City v. Mo. State Junior Chamber of Commerce*, 508 F.2d 1031, 1033 (8th Cir. 1975) (stating that there must be a finding of federal action before there is any deprivation of due process in violation of the Fifth Amendment); *Serna v. Goodno*, No. 04-615 (JMR/SRN), 2005 WL 1324090, at *5 (D. Minn. June 3, 2005) ("The Due Process Clause of the Fifth Amendment applies to actions of the federal government, while the Fourteenth Amendment applies to actions of the states.").  The Fourteenth Amendment's Due Process Clause, identical to that in the Fifth both in language and legal standard, is expressly applicable to the challenged state government action here. *See Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring in part) ("Of course the Due Process Clause of the Fourteenth Amendment has the same meaning.  To suppose that 'due process of law' meant one thing in the Fifth and another in the Fourteenth is too frivolous to require elaborate rejection.").  Because there is no federal action in this case, the Fifth Amendment is not implicated and therefore any asserted violations of the Fifth Amendment should be dismissed.  However, as explained throughout, this Court recommends that various claims under the Fourteenth Amendment survive.

which provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the proceedings used to implement them."  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quotations omitted).  When the government deprives a person of a fundamental right, such as the right to be free from the physical restraint imposed by civil confinement to a secure facility such as Moose Lake for what could be many years or even a lifetime, the state must prove the existence of a compelling state interest justifying the restraint of liberty.  *See Jones v. United States*, 463 U.S. 354, 361 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").  And the infringement of the person's liberty must be "narrowly tailored to serve [the] compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 302 (1993).  In other words, a court examining the constitutionality of a state's infringement of a fundamental liberty interest must strictly scrutinize the state's conduct to make sure that the infringement is necessary to achieve the state's compelling purposes and that there is no less restrictive alternative.  Substantive due process ensures that the state does not operate beyond the proper bounds of its power.

    The purpose for which a sexually dangerous or sexually psychopathic person is committed to the MSOP is two-fold: (1) mental health treatment for his mental disorder or dysfunction, and (2) removal of the danger to others posed by

41

the likelihood of commission of sex offenses if he is free.  Given this two-fold

purpose, the state has no constitutionally permissible interest in confining a

person who is not dangerous or who could become non-dangerous through the

reasonable efforts of the state.  The importance of the treatment component is

highlighted by the very nature of civil commitment under Minnesota law and the

rights afforded those committed.  For example, the law requires that a person

committed as a SDP or SPP be committed to a "secure *treatment* facility."  Minn.

Stat. § 253B.185, subd. 1(d) (emphasis added).  The law also specifically

provides the committed sex offender with "the right to receive proper care and

treatment, best adapted, according to contemporary professional standards, to

rendering further supervision unnecessary," and the right to an individualized

written treatment plan and periodic medical assessments.  Minn. Stat. § 253B.03,

subd. 7.

The Eighth Circuit has applied the principles of substantive due process to

the treatment obligations owed by Minnesota to civilly committed sex offenders in

*Bailey v. Gardebring*, 940 F.2d 1150, 1153–54 (8th Cir. 1991).  Bailey had been

confined as a psychopathic personality to the Minnesota Security Hospital after

he had kidnapped, raped, and murdered a thirteen-year-old girl.  *Id.* at 1152.

While at the hospital, Bailey saw a number of psychiatrists and psychologists and

was an intermittent participant in various treatment programs at the hospital.  *Id.*

After he was transferred to a prison to serve his sentence for his crimes, Bailey

brought a § 1983 action arguing that, as a civil or criminal committee, he had a

42

constitutional right to psychiatric treatment to overcome his sexual offender

condition and that the officials at both the security hospital and the correctional

facility failed to provide him with such treatment in violation of his Eighth and

Fourteenth Amendment rights.  *Id.* at 1152–53.  In its opinion, the court

specifically addressed Bailey's right to treatment in the civil commitment context.

*Id.* at 1153–54.  It noted that the Supreme Court in 1982 had held that a civilly

committed man who was severely mentally retarded had a constitutional right to

such "minimally adequate training . . . as may be reasonable in light of [his]

liberty interests in safety and freedom from unreasonable restraints."  *Id.* at 1154

(quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).  In *Youngberg*, the

training to which the Plaintiff was entitled was behavior modification training that

could lessen the need for the institution to use soft-shackles to restrain his

aggressive behavior.  In *Bailey*, the Eighth Circuit, applying *Youngberg* to sex

offender treatment, said that:

> Bailey can succeed on his claim only if he can show that the
> "presumptively valid" decision of the hospital psychiatrists not to
> provide the sort of treatment he seeks was "such a substantial
> departure from accepted professional judgment, practice, or
> standards as to demonstrate that the person responsible actually did
> not base the decision on such a judgment."

940 F.2d at 1154 n.4.  Bailey did not succeed in his claim, however, because

there was "insufficient evidence for a reasonable factfinder to conclude that the

DHS defendants' decisions[] were a substantial departure from accepted

professional practice."  *Id.* (quotations omitted).  Thus, the Eighth Circuit

concluded that summary judgment in defendants' favor was proper.

*Bailey* shows, however, that the proper focus in a case such as this one in which the committed sex offender contends that his treatment is constitutionally inadequate, should be on whether the state has provided treatment that is so inadequate that there has been "a substantial departure from accepted professional judgment, practice, or standards[.]" *Id.* (quoting *Youngberg*, 457 U.S. at 323). In making that decision, the Eighth Circuit cautioned, as the Supreme Court in *Youngberg* had, that "courts must show deference to the judgment exercised by a qualified professional," *id.* (quoting *Youngberg*, 457 U.S. at 322), but that does not mean that the federal court should forsake its obligation to determine whether the treatment is so inadequate that there is a constitutional deprivation.

It is important to note that in *Bailey* the district court's conclusion that there was insufficient evidence for a reasonable factfinder to conclude that there was a substantial departure from accepted professional treatment practice was made in a summary-judgment context, after an opportunity for developing the record was made; it was not made in a Rule 12(b)(6) context whereby the defendants were arguing that the complaint failed to state a claim for which relief could be granted. Therefore, when the Eighth Circuit concluded that Bailey "simply does not have the constitutional right he claims," *id.* at 1154, the court meant that he did not have the right to the specific psychiatric treatment he demanded because he had not shown that the decision of the professional psychiatrists and psychologists at

44

the Minnesota Security Hospital not to provide that treatment substantially deviated from accepted professional practice.

The importance of the treatment provided confined sex offenders to the constitutional inquiry is also evident in the Minnesota Supreme Court's decision in *In re Blodgett*, 510 N.W.2d 910 (1994), upholding the constitutionality of Minnesota's sexual psychopathic personality law. There the court found that the law did not violate the confined offender's substantive due process right, and the fact that the law provided for mental health treatment was critical to that result. Specifically, the court stated: "So long as civil commitment is programmed to provide treatment and periodic review, due process is provided." *In re Blodgett*, 510 N.W.2d at 916. The court relied on the fact that the statute enumerated specific rights to the civilly committed, including the rights of the committed person to an individualized written program plan, to periodic medical treatment, and to "proper care and treatment, best adapted, according to contemporary professional standards, to rendering further confinement unnecessary." *Id.* (citing Minn. Stat. § 253B.03, subd. 7). This built in the assurance that the due process requirement that "the nature of commitment bear some reasonable relation to the purpose for which the individual is committed," *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992),[6] was accounted for. *See In re Blodgett*, 510

---

[6]    In *Foucha v. Louisiana*, the United States Supreme Court held that a Louisiana civil commitment statute, which allowed a person acquitted by reason of insanity, who had an antisocial personality disorder but no longer a mental

(Footnote Continued on Next Page)

N.W.2d at 914. And it allowed the court to conclude that "the psychopathic personality statute does not violate substantive due process" because the law instructed that "if there [wa]s a remission of Blodgett's sexual disorder, if his deviant sexual assaultive conduct [wa]s brought under control, [Blodgett would be] entitled to be released." *Id.* at 916.

In addition, in 1997, the United States Supreme Court spoke about treatment when it analyzed the Kansas sexual predator law to determine whether the Kansas commitment statute violated the Double Jeopardy Clause or constituted an *ex post facto* law. *Kansas v. Hendricks*, 521 U.S. 346 (1997). The focus of the Court's opinion was on whether the Kansas commitment statute was so punitive in purpose that it could be considered criminal not civil, and it concluded that the Kansas Act's "overriding concern" of continued "segregation of sexually violent offenders" was consistent with a civil proceeding, "especially when that concern is coupled with the State's ancillary goal of providing treatment to those offenders[.]" *Id.* at 366. The Court made it clear that persons can be civilly committed as sexually dangerous even if they personally are not amenable to treatment or if effective treatment for sex offenders is not available. *Id.* But the Court also emphasized that Kansas had made a good faith effort to provide mental health treatment to the confined sex offenders, noting that

---

(Footnote Continued from Previous Page)
illness, to remain indefinitely committed to a mental hospital on the basis of dangerousness alone, violated substantive due process. 504 U.S. 71, 77–79 (1992).

"persons committed under the Act are now receiving in the neighborhood of 31 ½ hours of treatment per week." *Id.* at 368 (quotations omitted).  Although the Court was not addressing whether Hendricks had a constitutional right to treatment, it did rely, at least in part, on the fact that Kansas was providing this level of mental health treatment by trained staff as part of its rationale for finding that the Kansas commitment law was not punitive in purpose.

Minnesota's SDP/SPP law may also similarly pass constitutional review because it requires that proper care and treatment be made available to the confined sex offender.  However, this does not end the constitutional inquiry – especially here, where Plaintiff does not challenge the law on its face, but instead raises an "as applied" argument.

Even if the commitment law is facially valid, if the state in actual practice provides such inadequate treatment that it substantially deviates from professional norms for the treatment of sex offenders, then an unconstitutional deprivation could occur.  The role of the federal courts in determining whether such a constitutional right of a confined sex offender to substantive due process has been violated in connection with inadequate treatment availability, and remedying any such violation, is exemplified in *Turay v. Selig*, 108 F. Supp. 2d 1148 (W.D. Wash. 2000).  The court in that case articulated the constitutional principle that applies when adjudicating issues about the adequacy of mental health treatment afforded committed sex offenders:

> The Fourteenth Amendment Due Process Clause of the United
> States Constitution requires state officials to provide civilly-
> committed persons, such as these plaintiffs, with access to mental
> health treatment that gives them a realistic opportunity to be cured or
> to improve the mental condition for which they were confined.  *See
> Youngberg v. Romeo*, 457 U.S. 307, 319–22, 102 S.Ct. 2452, 73
> L.Ed.2d 28 (1982); *Ohlinger v. Watson*, 652 F.2d 775, 778 (9th Cir.
> 1980).  This rule applies to sex offenders, and "[l]ack of funds, staff
> or facilities cannot justify the State's failure to provide [those
> confined] with that treatment necessary for rehabilitation."  *Ohlinger
> v. Watson*, 652 F.2d at 778–79.  The *Youngberg* constitutional
> standard "determines whether a particular decision has substantially
> met professionally accepted minimum standards."  *Society for Good
> Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2nd
> Cir. 1984).

*Turay*, 108 F. Supp. 2d at 1151.

The court in *Turay* therefore focused on the same core question as the

Eighth Circuit did in *Bailey* – whether the mental health treatment afforded the

committed sex offender substantially deviated from professionally accepted

minimum standards for treatment necessary for rehabilitation.  In *Turay*, a trial

was held in 1994, and the jury found that the Washington Special Commitment

Center, where sexually violent predators were confined, was not providing him

and other residents constitutionally adequate mental health treatment.  108 F.

Supp. 2d at 1152.  Turay, among others, received damages as the result of a

settlement and the trial judge, Hon. William J. Dwyer, issued an injunction after

conducting an evidentiary hearing pertaining to injunctive relief.  *Id.* at 1150,

1152.  The court ultimately found that the treatment program at Washington's

Commitment Center had so departed from minimal professional standards that

the treatment professionals must not have based their treatment decisions on

their professional judgment.  *Id.* at 1151–52.  Some of the conditions that led to

the injunction included the following: inadequate staffing, inadequate training of

staff regarding the clinical mission of the facility, the lack of individualized

treatment, the absence of arrangements for clients to transition to being

released, inadequate provisions to allow clients' families to participate in

treatment, and a punitive treatment environment.  *See id.* at 1151 n.1.  The court

then fashioned injunctive relief that required the state officials to provide

constitutionally adequate mental health treatment to the plaintiff residents of the

confinement facility and monitored the compliance over a thirteen-year time

period, during which time it entered several contempt orders based on

defendant's failure to comply with the injunction.  *Id.* at 1152; *see also Turay v.*

*Richards*, No. C91-06614RSM, 2007 WL 983132 (W.D. Wash. Mar. 23, 2007)

(dissolving the injunction).

Two recent cases in this district have also dealt with the issue of a

committed sex offender's constitutional right to treatment.  In *Nicholaison v.*

*Ludeman*, the plaintiff filed a federal habeas petition seeking discharge from the

MSOP claiming, among other things, that he was not receiving adequate

treatment.  Nos. 07-3224, 07-3224 (RHK/JJG), 2008 WL 508549, at *1 (D. Minn.

Feb. 21, 2008).  In denying the habeas petition, the court stated that it was not

clearly established that a committed sex offender has a constitutional right to

adequate treatment.  However, the court in that habeas action was prohibited

from granting habeas relief unless there was a decision of the state court "that

49

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). In other words, in the context of a habeas petition, the focus had to be limited to whether the U.S. Supreme Court had clearly decided that committed sex offenders have a due process right to treatment; the issue was not whether there was such a constitutional right.

In this § 1983 case, however, the inquiry will not be so restricted. Here, the Court must determine whether there is such a constitutional right—not whether the Supreme Court has clearly decided the issue—and, if so, whether it has been violated. As explained above, the development of the law on this issue indicates that, at a minimum, Plaintiff should be able to proceed with his substantive due process claim that he is not receiving minimal adequate treatment because there is such a constitutional right. Of course, the scope of that right, and its application to Plaintiff's individual circumstances, will have to be litigated.

This district has also briefly addressed the treatment issue in *Semler v. Ludeman*, No. 09-0732 (ADM/SRN), 2010 WL 145275 (D. Minn. Jan. 8, 2010). That case was a § 1983 action in which two MSOP committees brought numerous claims about the conditions of their confinement. One of the many claims that they made was that the MSOP, in violation of constitutional due-process requirements, does not provide treatment for persons committed as sexually dangerous. *Id.* at *25–26. The court concluded that the plaintiffs had

50

failed to allege a due process claim after noting that this court had not recognized a constitutional right to effective treatment in the context of civilly committed sex offenders in *Nicholaison*. *Id.* at *26. As explained above, however, the court in *Nicholaison* was not required to determine whether it recognized a constitutional right to effective treatment. And the fact that the District of Minnesota had not previously had occasion to specifically rule on whether there is a constitutional right to effective treatment in the context of civilly committed sex offenders does not mean that there is no such constitutional right, the deprivation of which could be the subject of § 1983 relief. Further, unlike the court in *Semler*, this Court now has as part of the public record the March 2011 comprehensive report from the Office of the Legislative Auditor of the State of Minnesota, which evaluates the civil commitment of sex offender, details serious deficiencies in the mental health treatment afforded to sex offenders committed at Moose Lake, and expresses concern about whether the persons committed to the MSOP are receiving constitutionally adequate treatment. *See generally* 2011 Auditor's Report. Therefore, at the motion to dismiss stage, this Court has more than a committed sex offender's conclusory allegations to go on to determine whether Plaintiff has sufficiently pleaded his claim that minimally adequate mental health treatment is not being made available to Plaintiff at the MSOP. Thus, with the above as context, the question before this Court is whether Plaintiff's allegations about the adequacy of his own mental health treatment state plausible claims for relief.

     **(iii)**    **The Complaint States a Claim that Defendants have
Deprived Plaintiff of a Constitutional Right to Mental
Health Treatment**

Plaintiff describes his claim as follows:

> The statute mandates that during involuntary detention or
> commitment pursuant to Chapter 253B, the person is entitled to all
> constitutionally required care and treatment.  Mr. Thompson is
> entitled to such treatment as will give him a realistic opportunity to
> meet the statutory requirements to be released from confinement, as
> determined by an appropriate mental health professional and that is
> within the scope of acceptable mental health treatment.

(Doc. No. 9, Am. Compl. ¶ 31.)  He alleges that Defendants are responsible for

providing treatment to him and that they have denied him treatment.  (*Id.* ¶¶ 32–

33.)  Specifically, he alleges that "[a]lthough committed because of some

unspecified "mental abnormality," [D]efendants have not clinically diagnosed

what "mental abnormality" Mr. Thompson suffers and, as a consequence, have

not developed a specific or appropriate treatment plan."  (*Id.* ¶ 34; *see also id.*

¶ 36 (stating that Defendants have denied him the right to a treatment plan).)

Plaintiff also alleges that Defendants –

> have not provided [him] treatment by a psychiatrist or licensed
> clinical psychologist trained, quali[fied], certified or licensed to
> provide meaningful treatment to a sexually psychopath
> personality/sexually dangerous person.  None of the [D]efendants or
> any of the employees treating consultants at MSOP is qualified,
> certified or licensed to treat sexually dangerous persons.  Neither
> Mrs. Collins nor Mrs. Rose, both of whom at various times have
> been Mr. Thompson's primary therapist, are qualified, certified or
> licensed in psychiatry, psychology or therapy or qualified to treat
> Mr. Thompson in any way.

(*Id.* ¶ 35; *see also id.* ¶ 36 (stating that Defendants "refused to provide any

treatment so far").)  In addition, Plaintiff alleges that he is being provided a one-hour-per-week "support group," but he has made repeated requests for more frequent and intensive individualized treatment sessions, which Defendants have denied.  (*Id.* ¶ 37.)  He also states that he has not been permitted to attend any group therapy session, and asserts that Defendants "have indicated that he may not enter group sessions even though he has completed all evaluations."  (*Id.* ¶ 38.)  Finally, Plaintiff states that he suffers from depression and possibly other "emotional disorders," and he alleges that Defendants "have failed or refused to provide medications to help deal with these emotional management disorders," and "have refused or failed to make any appropriate emotion management available" to Plaintiff.  (*Id.* ¶¶ 39–40.)  Taking Plaintiff's allegations as true, this Court concludes that the Amended Complaint pleads a viable constitutional claim that adequate treatment is not being made available to Plaintiff at the MSOP.[7]

In addition to Plaintiff's specific allegations, this Court's conclusion is further supported by the Office of the Legislative Auditor of the State of

---

[7]    Plaintiff alleges that, in addition to the statutory and constitutional requirements that Defendants have not complied with, Faribault County had ordered that Defendants were to "provide treatment that is up to professional and clinical standards of care under the law[.]"  (Am. Compl. ¶ 31.)  Because of the lack of treatment provided by Defendants, Plaintiff asserts that they "have maliciously violated the court[']s order[.]"  (*Id.*)  Therefore, Plaintiff asserts a separate cause of action titled "Violation of Court Ordered Treatment."  (*Id.* ¶¶ 221–22.) Because this Court concludes that Plaintiff's First Cause of Action for Failure to Provide Treatment survives Defendants' motion to dismiss, Plaintiff's Thirteenth Cause of Action for "Violation of Court Ordered Treatment" similarly survives.

Minnesota's March 2011 public report evaluating the civil commitment of sex

offenders in Minnesota.[8]  In the auditor's report, the following conclusions and

findings were made, among others:

- No civilly committed sex offender has ever been discharged from MSOP since the program started in 1994. One factor that may explain why there has never been a discharge from the program is that "problems in the treatment program over the last ten years have likely affected the progress of some sex offenders." 2011 Auditor's Report at xii.

- Most MSOP clients are not receiving any actual sex offender treatment at all. As of June 30, 2010, when there were approximately 575 persons in MSOP commitment, about 50% were in Phase One of the treatment program. "Phase One of the program does not focus directly on the behaviors that led to offenders' commitments. Rather, Phase One is focused on preparing clients for treatment by asking clients to demonstrate that they can follow rules and learn how to participate in treatment groups. Phase One treatment does not explore the reason for offenders sexual offending or help offenders develop tools to prevent offending. Some clients may be 'stuck' in Phase One because they lack motivation. However, some clients may also be in Phase One because the program has not been sufficiently staffed or because the environment at Moose Lake has not promoted positive treatment participation. Many clients who are in Phase One have been at an MSOP facility for years and have participated in a lot of sex offender specific treatment at MSOP previously." *Id.* at 64.

- "Frequent leadership changes have contributed to a lack of continuity in MSOP's treatment program. The program has had three executive directors and four executive clinical directors in the last seven years. Due to these many leadership changes, the content of the treatment program MSOP facilities have changed multiple times since 2003. With each change in leadership and the treatment program, clinicians and clients have needed to learn the new program. Also, clients have had to be reassessed according to new program requirements. At times, clinicians have lacked supervision to help

---

[8]     It is proper for the Court to consider this report in ruling on Defendants' motion to dismiss because it is part of the public record and necessarily embraced by the pleadings. *See Porous*, 186 F.3d at 1079; *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997). This Court only considered this public record for purposes of determining whether there is a plausible claim for relief.

them make good clinical decisions.  Because of the changes in MSOP's leadership and the treatment program, the program has not been able to deliver consistent treatment to its residents." *Id.* at 58.

- MSOP has had difficulty filling clinical supervisor positions at the Moose Lake facility.  And "[w]ith a dearth of clinical supervisors, MSOP has been unable to assure that all clinicians are implementing a therapeutic style consistent with best practices or applying the treatment model in the way the clinical directors envision." *Id.* at 60.

- "Clinician caseloads at Moose Lake have been too high due to clinician turnover and many clinical vacancies.  Clinical understaffing has been a very serious problem, which has affected the ability of the program to deliver treatment to clients.  The executive clinical director said that the goal—with a fully staffed program—is to have eight clients per clinician . . . . However, the clinical director stated that the clinicians at Moose Lake have sometimes had up to 25 clients in their caseloads . . . . In general, we observed that files in recent years (since 2008) tended to have much less detail than those from previous years, suggesting that clinicians either did not have time to fully document client behaviors or be fully aware of client behaviors relevant to treatment . . . . Due to clinician turnover, clients often have not had the benefit of consistent clinical care." *Id.* at 60–61.

- "The amount of treatment delivered at MSOP facilities is lower than any other adult inpatient sex offender treatment program in this state . . . . MSOP clients at Moose Lake [in the auditor's sample] generally received between 6 and 7.5 hours per week of group therapy and psychoeducational classes.  In contrast, [the Department of Correction] provides between 9 and 10.5 hours per week of group therapy and psychoeducational classes" for its sex offender treatment.  Privately operated Alpha Human Services, which provides a comparable type of treatment, provides at least 16 hours per week—more than double what MSOP offers.  Even though "MSOP was designed to hold and treat the highest risk offenders in the state[,] . . . "it appears that offenders who are lower risk (in the DOC program or Alpha Human Services) receive more intensive treatment as measured by hours of sex offender treatment per week." *Id.* at 62–64.

- "MSOP is at the low end of the range of treatment hours considered to be best practices for sex offender civil commitment programs . . . . It has been difficult for MSOP to schedule treatment hours due to clinical staffing shortages.  In 2009, psychoeducational modules at Moose Lake were completely suspended for three quarters due to staff vacancies.  While MSOP has increased weekly treatment hours for some clients from 6 hours to 7.5 hours, the amount of

treatment still remains on the low end of the spectrum as outlined by [outside] experts."  *Id.* at 64.

- "Historically and currently, the program [at MSOP] has struggled to create an environment that fosters client rehabilitation.  Outside advocates and experts, MSOP clients, and some MSOP staff have complained that, historically and currently:  (1) some MSOP staff held disrespectful, negative, punitive, and untherapeutic attitudes towards clients; and (2) that the culture at the facilities was counter-therapeutic."  *Id.* at 66.

- Recent security changes "have adversely affected the therapeutic environment [in MSOP], particularly at Moose Lake.  In our interviews, we heard widespread agreement among clinicians, clients, outside advocates, experts, and some MSOP administrators that the program has recently focused on security to the detriment of therapy.  In the absence of clinical leadership when the current administration took over MSOP in 2008, some policies were put into place without adequate consideration for the effect those policies would have upon the therapeutic environment."  *Id.* at 68.

- In focus groups conducted by the legislative auditor team, "clients at Moose Lake expressed a great amount of hopelessness regarding the possibility of their release."  The resulting lack of client motivation "has been a barrier to progression in treatment."  "Clients cited a 2003 executive order prohibiting the release of anyone from MSOP without a court order as evidence that the program does not truly seek to rehabilitate them.  They described living at Moose Lake as so stressful under the new administration so that some have sought revocation of their supervision so that they may return to correctional facilities where they at least saw people being released.  Many clients also struggled with motivation because of the frequent changes in the treatment programming and in the MSOP administration."  *Id.* at 71.

- "MSOP treatment plans and reviews are individualized and set meaningful goals, but do not provide the level of detail as past plans and reviews, nor are they as explicit about how clients can advance in treatment . . . . [I]t is not always clear from these reviews what the client needs to do to advance in treatment, especially when the client is meeting all their goals and doing well in treatment.  Clinicians also do not always explain or discuss how they came to their conclusions about client progress."  *Id.* at 73.

- The executive clinical director noted that "the program did not deliver treatment for eight to ten working days between trimesters so that staff could do all the documentation required.  This resulted in the program not delivering

treatment for one month out of the year, which she found unacceptable." *Id.* at 74.

To be sure, there are parts of the auditor's report that would suggest that the state has made available to Plaintiff adequate mental health treatment. For example, the report says that MSOP's current approach is to provide treatment based on cognitive behavioral therapy and treatment principles of risk, need, and responsivity and that current research suggests that this type of therapy is most effective for reducing sex offender recidivism. However, the skepticism that the report creates is not only perceived by this Court, but others as well. For example, Justice Page of the Minnesota Supreme Court recently shared his skepticism in a concurring opinion, stating the following:

> In light of the recent report released by the Office of the Legislative Auditor (OLA), it is disingenuous to claim that the State has a strong interest in rehabilitating sexually dangerous persons. *See* Office of the Legislative Auditor, State of Minnesota, *Evaluation Report: Civil Commitment of Sex Offenders* (2011).[] In fact, the OLA found that the Minnesota Sex Offender Program (MSOP) "is at the low end of the range of treatment hours considered to be best practices for sex offender civil commitment programs," has "generally delivered less treatment than civil commitment programs in other states," and should "provide more treatment hours." *Id.* at 64–65. The report warns, "Civilly committed sex offenders retain certain civil rights, including the right to treatment. Without an adequate treatment program, Minnesota could face a legal challenge." *Id.* at x. The State's disinterest in rehabilitation is reinforced by the fact that "no sex offender has ever been discharged from MSOP." *Id.* at 19.

*In re Johnson*, 800 N.W.2d 134, 148 (Minn. 2011) (Page, J., concurring) (footnote omitted). Nonetheless, this Court is cognizant of the fact that this case must ultimately focus on Plaintiff's individual claim about whether he has been

deprived of his constitutional rights; therefore, issues concerning Plaintiff's

mental health treatment, such as his own willingness to accept and participate in

a treatment regimen, may be in issue.  But at this stage of the case, this Court

concludes that Plaintiff has alleged sufficient facts to at least state a plausible

claim that he has been unconstitutionally deprived of mental health treatment at

MSOP under the Fourteenth Amendment Due Process Clause.  Although

Defendants contend that "the Constitution only requires such minimally adequate

training that may be reasonable in light of the liberty interest in freedom from

unreasonable restraints," (Doc. No. 17, Defs.' Mem. 35), the issue that will be

litigated in the case is whether the treatment program that is being made

available to Plaintiff at MSOP comports with constitutional requirements.

Accordingly, this Court recommends that Defendants' motion to dismiss be

denied as to Plaintiff's First Cause of Action titled "Failure to Provide Treatment."

**B.    Claims Based on the Right to be Free From Punishment[9]**

**(i)    Right to be Free from Punishment and to a Less
        Restrictive Alternative**

Minnesota's civil commitment law for sex offenders is not intended to be

punitive.  Its purported purpose is to protect the public while the committed

---

[9]    Plaintiff lists various causes of action that fall into this category and can be
analyzed together.  This includes Plaintiff's Sixth, Eighth, Ninth, and Tenth
Causes of Action, titled "Denial of the Right to be Free From Punishment,"
"Denial of Less Restrictive Alternative," "Denial of the Right to be Free F[ro]m
Cruel and Unusual Punishment," and "Denial of the Right to be Free from Double
Jeopardy," respectively.

individual is treated for his mental abnormality.  If, however, the committed sex offender is put into indefinite physical confinement under punitive conditions that thwart adequate treatment, then the committee's right to substantive due process under the Fourteenth Amendment is implicated.  "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed."  *Foucha*, 504 U.S. at 79; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).  Therefore, if Plaintiff can show that, contrary to the purpose of the SDP/SPP commitment law, the nature of his commitment is punitive incarceration without any meaningful opportunity for release, then he has a plausible claim that his fundamental liberty interest protected by the Fourteenth Amendment has been violated by arbitrary government action.  It would be arbitrary in the sense that his punitive confinement, depriving him of a fundamental constitutional right, would not align with the statute's purported purpose of protecting the public while the Plaintiff receives "proper care and treatment, best adapted, according to contemporary professional standards, to rendering further confinement unnecessary."  Minn. Stat. § 253B.03, subd. 7.  If Plaintiff made such a showing, then the infringement on his liberty would not be "narrowly tailored to serve a compelling state interest."  *Reno*, 507 U.S. at 302.

Here, Plaintiff alleges that Defendants have taken various actions that are punitive in nature and that were not made for any legitimate security or treatment concerns.  He is being confined, he argues, in punitive conditions that are antithetical to the treatment purpose of the confinement.  Specifically, Plaintiff

alleges that Defendants place him and other MSOP residents on "Restriction Status" for perceived violations of rules or other misbehavior; place him and other MSOP residents on "Lockdown" when others violate facility rules; deny him and other MSOP residents time to use the gym or yard as a form of punishment; deny him employment; remove furniture, including televisions and bookshelves as a form of punishment; deny him meals; deny certain residents the right to attend religious services; separate him and other MSOP residents who have filed § 1983 actions from those who have not; and deny him entry to group therapy sessions. Plaintiff also alleges that, partly due to the overcrowding at the facility, Defendants have allowed for and/or implemented overly restrictive conditions of confinement. Some of these conditions include the fact that he is required to be double-bunked with a highly dangerous sex offender, that he is forced to eat in the recreation center, and that he can no longer freely go to the gym and exercise. In addition, Plaintiff alleges that Defendants have developed and imposed many policies, procedures, and practices that are excessively restrictive, including the following:

- The policy to routinely search the contents of his incoming as well as outgoing mail;
- The practice of intentionally, but unnecessarily, delaying delivery of his mail;
- The policy and practice of restricting which magazines and newspapers he may read;
- The policy and practice of censuring or removing articles and sections from the newspaper;
- The policy and practice of restricting his access and conduct during visitation;

- The policy and practice of strip searching him after visitation, despite the excessive monitoring and conduct regulations;
- The policy and practice of strip searching and shackling him during transportation by MSOP personnel;
- The policy and practice of restricting his access to both a regular library and a law library;
- The policy and practice of conducting random, unreasonable and unwarranted searches of his quarters, property and person;
- The policy and practice of denying him food if he is late or staff refusing to deliver it to him[;]
- The policy and practice of denying him access to hot water for tea, coffee, or soup[;]
- The policy and practice of denying him access to a microwave or hot pot;
- The policy and practice of monitoring his telephone calls;
- The policy and practice of constantly monitoring his every action and conversation;
- The policy and practice of denying him access to recreational activities and exercise;
- The policy and practice of requiring a staff person to be present and observe him any time he visits medical care providers;
- The policy and practice of restricting what he can purchase from the inmate store;
- The policy and practice of denying him educational programming;
- The policy and practice of monitoring him during religious services[;]
- The policy and practice [of monitoring] him when speaking with clergy or other religious volunteers;
- The policy and practice of denying him any meaningful employment opportunity;
- The policy and practice of permitting MSOP staff to punish him by denying him employment;
- The policy and practice of denying him access to hobbies;
- The policy and practice of denying him access to either the big or small yard for months at a time;
- The policy and practice of restricting the time he is allowed access to the yard;
- The policy and practice of forcing him to buy from approve[d] venders only, even though staff check all incoming mail;
- The policy and practice of allowing staff to punish him by denying him access to the yard or to the gym;
- The policy and practice of allowing staff to unilaterally punish him by locking him in his room;

- The policy and practice of denying him the right to have his television set sent to him by his parents;
- The policy and practice of punishing him by the use of Behavior Expectation Reports;
- The policy and practice of punishing him by removing furniture;
- The policy and practice of punishing him by taking away his right to recreation for months at a time;
- The practice of punishing him by denying him access to group therapy;
- The policy and practice of keeping those residents who have filed lawsuits separated [from] the other residents;
- The policy and practice of limiting telephone calls to his lawyers;
- The policy and practice of doing security checks every half hour, by knocking loudly and disruptively every half hour;
- The policy and practice of forcing him to stand up for count under the threat of punishment;
- The policy and practice of forcing him to wear a sex offender ID badge under the threat of punishment;
- The policy and practice of allowing staff to shakedown his room at any time;
- The policy and practice of creating a prisoner disciplinary board that do not follow constitutional standard of prisoner due process under U.S. case law;
- The policy and practice of creating prison policies to trump his statutory right to the Patient bill of rights;
- The policy and practice of taking away the basic life skills of allowing client to manage their personal financial affairs;
- The policy and practice of taking away the right to room visit;
- The policy and practice of taking away the right to drug and alcohol treatment;
- The policy and practice of denying him the right to greet and shake hands with other peers in treatment;
- The policy and practice of denying him the right to share food with others; [and]
- The policy and practice of denying him the right to wear certain clothes such as hats, bandana[s], and muscle shirts, within the confines of his own living unit.

(Doc. No. 9, Am. Compl. ¶ 91.)  Plaintiff then further alleges more detail with

respect to at least some of the policies and practices listed as they applied to

him.  (*See id.* ¶¶ 93–186.)

In addition, the 2011 Auditor's Reports again lends support in Plaintiff's favor as to the substantive due process punishment related claims. The Report states that "some MSOP staff held disrespectful, negative, punitive, and untherapeutic attitudes towards clients" and that "the culture at the facilities was counter-therapeutic." 2011 Auditor's Report at 66. And "[s]ome security changes made by the current MSOP administration have adversely affected the therapeutic environment." *Id.* at 68. Specifically, the report states that "[i]n the absence of clinical leadership when the current administration took over MSOP in 2008, some policies were put into place without adequate consideration for the effect those policies would have upon the therapeutic environment." *Id.* Also, consistent with Plaintiff's allegations in his Amended Complaint, the Auditor's Report describes how "isolated incidents resulted in general policies which took away privileges from all clients":

> For example, MSOP prohibited clients from sharing food with each other. Because of concerns about inappropriate touching, clients are no longer allowed to shake hands with each other or staff. Clients who were once allowed to move within the facility on their own schedule are now required to move together at specifically set times.

*Id.* at 68. Clinicians told the auditors that "these types of restrictions undermined their efforts to promote client independence and prosocial behaviors." *Id.* Further, "[p]rogram managers now recognize that some security changes they thought were necessary in 2008 may be out of balance with therapeutic concerns and told [the auditors] they are considering changes." *Id.*

Although some of Plaintiff's allegations may not be enough to support certain of Plaintiff's other asserted causes of action (as explained further below), taking Plaintiff's allegations as true, and reading Plaintiff's Amended Complaint liberally, this Court concludes that Plaintiff has met the pleading requirements for pleading a substantive due process claim under the Fourteenth Amendment that Defendants have placed him in punitive conditions that thwart adequate treatment. Accordingly, this Court recommends that Defendants' motion to dismiss be denied as to Plaintiff's Sixth Cause of Action titled "Denial of the Right to be Free from Punishment," Plaintiff's Eighth Cause of Action titled "Denial of Less Restrictive Alternative," and Plaintiff's Seventh Cause of Action titled "Denial of the Right to Religion and Religious Freedom."[10]

### (ii)    Right to be Free from Cruel and Unusual Punishment

In Plaintiff's Ninth Cause of Action he alleges that Defendants have deprived him of his constitutional right to be free from cruel and unusual punishment in violation of his First, Fifth, and Fourteenth Amendments. (Am.

_____

[10]    In Plaintiff's Seventh Cause of Action he alleges that Defendants deprived him of his religious rights in violation of the First, Fifth, and Fourteenth Amendments. This Court concludes that Plaintiff's allegations regarding the religious restrictions placed upon him can be liberally construed to support both his substantive due process claim and his First Amendment claim, the latter of which is explained below.

Compl. ¶ 213.)[11]  Defendants argue that because Plaintiff has alleged that the

Defendants' actions have violated his right to be free from cruel and unusual

punishment, he implicates that Eighth Amendment.  And because the Eighth

Amendment applies only to persons who are in custody as punishment for a

criminal conviction, Plaintiff's Eighth Amendment cruel and unusual punishment

claim must be dismissed.[12]

       As a civilly committed detainee, Plaintiff is protected by the Due Process

Clause of the Fourteenth Amendment as explained above.  Simply because

Plaintiff is not in custody as punishment for a criminal conviction does not,

however, mean that Plaintiff has no protection against cruel and inhumane

treatment.  "His protection against cruel and inhumane treatment has been

defined as at least as extensive as that afforded to prisoners by the Eighth

Amendment."  *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008).  "[T]he more

---

[11]     This Court notes that although Plaintiff asserts the First Amendment, the First Amendment does not apply to Plaintiff's cruel and unusual punishment claim.

[12]     In the body of Plaintiff's Amended Complaint, in the section purportedly relating to his claim under the Minnesota Human Rights Act, he does assert that he has been subjected to cruel and unusual punishment, among other things, and he references the Eighth Amendment in addition to the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments.  (Am. Compl. ¶ 195.)  Because Plaintiff more clearly references in his cause of action that he is asserting protection from cruel and unusual punishment under the Fourteenth Amendment, without referencing the Eighth Amendment, this Court believes that his reference to the Eighth Amendment earlier may have been a mistake.  Nonetheless, this Court reads Plaintiff's pleading liberally, and concludes that he has asserted this claim under the Fourteenth Amendment.

protective fourteenth amendment standard applies to conditions of confinement when detainees . . . have not been convicted" of a crime.  *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982) (civilly committed individuals), and *Bell v. Wolfish*, 441 U.S. 520 (1979) (pretrial detainees)).  Both the Eighth and Fourteenth Amendment require that Plaintiff be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care[.]"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  However, "[t]he Fourteenth Amendment requires the government to do more than provide the 'minimal civilized measure of life's necessities,' . . . for non-convicted detainees."  *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Here, Plaintiff has appropriately asserted his claim to be free from cruel and unusual punishment under the Fourteenth Amendment, and any claim that might arguably arise from the Eighth Amendment is effectively subsumed in Plaintiff's Fourteenth Amendment claims.[13]  And as explained above, this Court concludes that Plaintiff has alleged a plausible substantive due process claim under the Fourteenth Amendment that Defendants have placed him in punitive conditions that thwart adequate treatment.  The same allegations that support that claim also support a plausible cruel and inhumane treatment claim under the

---

[13]    To be clear, this Court has determined that Plaintiff has not pleaded a separate actionable claim based on the Eighth Amendment.

Fourteenth Amendment.  Accordingly, this Court recommends that Defendants'
motion to dismiss be denied as to Plaintiff's Ninth Cause of Action titled "Denial of
the Right to be Free F[ro]m Cruel and Unusual Punishment."

### (iii)    Inadequate Medical Care

This Court considers Plaintiff's inadequate medical care claim to also be
subsumed in Plaintiff's Fourteenth Amendment claims.  The independent
inadequate medical care claim, however, should be dismissed.  To plead a
Fourteenth Amendment violation arising out of inadequate medical care, a
plaintiff must allege (1) "that [he] suffered objectively serious medical needs" and
(2) that the charged defendant(s) "actually knew of but deliberately disregarded
those needs." *E.g.*, *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006)
(quoting *Dulaney v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).  "A serious
medical need is one that has been diagnosed by a physician as requiring
treatment, or one that is so obvious that even a layperson would easily recognize
the necessity for a doctor's attention."  *Coleman v. Rahija*, 114 F.3d 778, 784
(8th Cir. 1997) (quotations omitted).  "Deliberate indifference may be manifested
by prison doctors in responding to the prisoner's needs or by prison officials in
intentionally denying or delaying access to medical care or intentionally
interfering with prescribed treatment."  *Meloy v. Bachmeier*, 302 F.3d 845, 849
(8th Cir. 2002).  It is well settled that "personal involvement or responsibility" of
defendants in the alleged constitutional deprivations is required.  *Ellis*, 179 F.3d
at 1079.  A federal official cannot be vicariously liable for the acts of his

subordinates under the doctrine of respondeat superior, unless he was personally involved in, or participated in the unconstitutional acts. *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). A plaintiff must show an affirmative link between the misconduct and the adoption of any plan or policy by the defendant showing the authorization or approval of such conduct. *Rizzo*, 423 U.S. at 371.

Here, Plaintiff has not alleged personal involvement or responsibility of Defendants with regard to the specific incident where Plaintiff was allegedly not timely provided medical treatment for his bleeding mouth. There is no allegation that any of the Defendants knew of this specific incident, let alone of a substantial risk of serious harm to him. Accordingly, Plaintiff has failed to state a claim against Defendants for inadequate medical treatment with respect to this claim.

However, the facts alleged about Defendants' policy requiring approval of a physician's assistant in order to receive over-the-counter treatments, and that Plaintiff has had to suffer pain because MSOP frequently has no physician's assistant on duty, does raise an issue. Because Plaintiff has not pleaded facts that would show that at any of the times he sought over-the-counter treatment he was suffering from a serious medical need, his inadequate medical care claim fails. But this Court notes that Plaintiff's underlying facts regarding the policies in place that affect his medical treatment and the facts regarding inadequate staffing can be used to support Plaintiff's punishment-related substantive due process claims, as these facts could support Plaintiff's assertion that he has been

68

placed in punitive conditions that thwart adequate treatment.

### (iv)    Equal Protection Claim

It appears that Plaintiff may also be attempting to bring a separate claim for relief under the Equal Protection Clause of the Fourteenth Amendment. Specifically, he alleges that he along with others living in the Behavioral Therapy Unit ("BTU") are more restricted and given less comforts than others in other units in MSOP as well as those in the DOC, including that BTU residents "are not allowed to even speak to other residents when passing by or greet them and shake their hand." (Am. Compl. ¶ 83.) He also alleges that he is only allowed thirty minutes in the library, while other units are allowed an hour; that his hotpot was taken from him even though the rest of the people in MSOP are allowed to have a hotpot; and that he has been denied a right to a game system, DVD player, and DVDs, while the rest of MSOP is allowed to have these items. (*Id.* ¶¶ 119, 144, 145.) He also makes reference to situations in which he is treated differently than how others are treated in the DOC. (*See id.* ¶ 124 (stating that he had more access to a law library and was monitored less when he was in prison); ¶ 162 (stating that inmates at the DOC get sometime up to six hours a day outside in the yard, which he and other MSOP residents get only one hour a day); ¶ 173 (stating that he is not provided an inmate account system to balance his canteen purchases, but the DOC provides this); ¶ 177 (stating that the DOC institutions contract with a local community college to provide qualified and consistent educational programming and services to inmates, but Defendants

have not made such arrangements for Plaintiff or other residents at MSOP). In addition, he alleges that because of the lack of treatment, he is not allowed to reduce his risk level in order to be discharged as prisoners may do in the DOC. (*See id.* ¶ 189.) Defendants argue that Plaintiff has failed to plead an actionable claim because he does not compare himself to other similarly situated people.

To state an actionable equal protection claim, a complainant must allege a set of facts showing that the named defendants treated the complainant differently from other similarly situated individuals, based on some prohibited form of discrimination. *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) ("In order to establish such an equal protection claim, a prisoner must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a 'fundamental right.'") (quoting *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006)); *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) (stating that to sustain an equal protection claim, plaintiff must show that he belongs to a group that had been treated less favorably than others who are "similarly situated"); *Beaulieu v. Ludeman*, No. 07-cv-1535 (JMR/JSM), 2008 WL 2498241, at *12 (D. Minn. June 18, 2008) ("Absent a threshold showing that plaintiffs are similarly situated to those who allegedly receive favorable treatment, plaintiffs do not have a viable equal protection claim."). Once it has been demonstrated that the parties are similarly situated, if the alleged action does not infringe a fundamental right or apply to a suspect classification, the court applies

a rational basis review.  *Gavin v. Branstad*, 122 F.3d 1081, 1089–90 (8th Cir. 1997).  Under rational basis review, the action or law will meet constitutional standards if the dissimilar treatment is "rationally related to a legitimate state interest."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Here, Plaintiff has not alleged any facts showing that he has been treated differently from other similarly situated individuals at the MSOP (i.e., individuals living in the BTU or Omega Unit).  This Court has held that detainees at one facility or unit are not considered similarly-situated to detainees at other facilities or units for equal protection purposes.  *Aune v. Ludeman*, No. 09-0015 (JNE/SRN), 2010 WL 145276, at *9 (D. Minn. Jan. 8, 2010); *Beaulieu*, 2008 WL 2498241, at *13; *Jackson v. Wengler*, No. 07-3587 (JRT/FLN), 2007 WL 3275102, at *6 (D. Minn. Nov. 2, 2007).  Following this Court's precedent, Plaintiff may not be considered similarly-situated to detainees at other facilities or units for equal protection purposes.  Therefore, this Court concludes that Plaintiff's Amended Complaint fails to state an actionable equal protection claim, and to the extent Plaintiff was attempting to assert such a claim, it should be dismissed.

### (v)    Right to be Free from Double Jeopardy

Reading Plaintiff's Amended Complaint liberally, Plaintiff appears to allege that because the unduly restrictive conditions of his confinement at Moose Lake are punitive in nature, because he may be indefinitely detained, and because he has no access to adequate treatment, his commitment amounts to punitive detention in violation of the Double Jeopardy Clause.  This Court concludes that

Plaintiff cannot plead such a claim as a matter of law.

The Double Jeopardy Clause of the Fifth Amendment protects against
multiple prosecutions for the same offense and is applicable to the states through
the Fourteenth Amendment.[14]  *Benton v. Maryland*, 395 U.S. 784, 794 (1969);
*see* U.S. Const. amend. V ("[N]or shall any person be subject for the same
offence to be twice put in jeopardy of life or limb[.]").  The Minnesota Supreme
Court in *Call v. Gomez*, 535 N.W.2d 312 (Minn. 1995) reaffirmed that its decision
in *In re Blodgett* "clearly establishes that commitment under the psychopathic
personality statute is remedial and does not constitute double jeopardy because
it is for treatment purposes and is not for purposes of preventive detention."  535
N.W.2d at 320 (citing *In re Blodgett*, 510 N.W.2d at 916).  Further, this District
has reviewed the psychopathic personality statutes and determined after also
reviewing two key U.S. Supreme Court decisions that "[c]ommitment under the
statutes is civil, not criminal" and thus "protections against double jeopardy do not
attach."  *Nicolaison*, 2008 WL 508549, at *5 (discussing *Kansas v. Hendricks*,
521 U.S. 346, 361 (1997) and *Seling v. Young*, 531 U.S. 250 (2001)).  In *Seling*,
the U.S. Supreme Court confirmed that "[t]he civil nature of a confinement
scheme cannot be altered based merely on vagaries in the implementation of the
authorizing statute," and concluded that "[a]n Act, found to be civil, cannot be

---

[14]     In Plaintiff's Amended Complaint, he alleges violations of his double-
jeopardy rights guaranteed under the First, Fifth and Fourteenth Amendment.
(Am. Compl. ¶ 215.)  The First Amendment, however, does not guarantee
double-jeopardy protection.

deemed punitive 'as applied' to a single individual in violation of the Double

Jeopardy and *Ex Post Facto* Clauses[.]"   531 U.S. at 263, 267.  And unlike the

case in *Hendricks*, this Court is not presented with the question as to whether the

Act at issue was punitive.  (*See* Am. Compl. ¶ 30 ("Although Mr. Thompson

believe that Chapter 253B is unconstitutional he is not challenging his Chapter

253 in this litigation.").)  Therefore, this Court concludes that the issue is settled,

and Plaintiff cannot raise an "as-applied" challenge to the Minnesota

psychopathic personality statute on double-jeopardy grounds.[15]  Accordingly, this

Court recommends that Plaintiff's Tenth Cause of Action titled "Denial of the

Right to be Free from Double Jeopardy" be dismissed.

### C.   First Amendment Claims

Plaintiff alleges that Defendants have restricted his right to freedom of

speech and expression and his right to freedom of religion in violation of the First

Amendment.  (Am. Compl. ¶¶ 199, 209 (Second and Seventh Causes of Action).)

Throughout his Amended Complaint, he asserts various actions by Defendants

---

[15]   This Court notes that this conclusion does not preclude Plaintiff from bringing his substantive due process claim concerning the punitive conditions of confinement in the enforcement of the statute that is non-punitive on its face. *See Seling*, 531 U.S. at 265 (stating that the Court's decision did "not mean that respondent and others committed as sexually violent predators have no remedy for the alleged conditions and treatment regime at the [places of confinement] . . . . [T]hose confined may have a state law cause of action . . . . [and] due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed"). Accordingly, a § 1983 action concerning the punitive conditions of confinement is still viable, at least at the Complaint stage.

that could relate to these causes of action that he contends are excessively restrictive, including the following: having policies and practices of searching his incoming and outgoing mail; delaying delivery of his mail; restricting which magazines and newspapers he may read; censoring sections of the newspaper; limiting his access to libraries; monitoring his phone calls and actions; monitoring during religious services or when speaking with clergy or other religious volunteers; keeping those residents who have filed lawsuits separated from the other residents; limiting phone calls to lawyers; forcing him to wear a sex offender ID badge; taking away the right to room visit; denying him the right to greet and shake hands with other peers; and denying him the right to wear certain clothes such as hats, bandanas, and "muscle" shirts within the confines of his own living unit. Defendants argue that several of Plaintiff's First Amendment claims should be dismissed. This Court addresses Defendants' arguments in turn.

### (i)    Claims related to MSOP's mail policy

Defendant argues that Plaintiff's claims regarding delay and loss of his mail should be dismissed because Defendants have now—as Plaintiff acknowledges—established a policy that corrects previous issues with the loss and late delivery of mail. In addition, Defendant argues that any claim based on the delay that results from the review of the package by the Media Review Team should be dismissed because the Media Review Team evaluates items that could be viewed as contraband under the MSOP's Media Policy, which has been found to be constitutional under the *Turner* factors. *See Semler*, 2010 WL 145275, at

74

*10; *Ivey v. Mooney*, Civ. No. 05-2666 (JRT/FLN), 2008 WL 4527792, at *5–6 (D.

Minn. Sept. 30, 2008).[16]

As with prisoners, civilly committed persons retain those First Amendment

---

[16]    Courts in this district have found that the *Turner* analysis (as modified for those civilly committed as sexually dangerous) is appropriate for analyzing a involuntarily committed person's First Amendment claims. *See Beaulieu*, 2008 WL 2498241, at *20 n.15.  The Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), sought to "formulate a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights."  *Id.* at 85 (alteration in original) (quotations omitted).  The Court announced that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Id.* at 89.  The Court then concluded that when determining whether a prohibition on a constitutional right is reasonable, a court is to consider four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising the right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives with which the prison could continue to serve its interest without impinging on constitutional rights.  *Id.* at 89–90. Here, Plaintiff is not a prisoner, which, like the plaintiff in *Ivey*, takes his cause beyond the specific holding in Turner.

As this District explained in *Ivey*, the Eighth Circuit has indicated that those who are civilly committed as dangerous person have limited rights as well.  *Ivey*, 2008 WL 4527792, at *4 (citing *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)).  While they are entitled to "more considerate treatment and conditions of confinement" than prisoners, their "liberty interests are considerably less than those held by members of free society."  *Id.* (quoting *Senty-Haugen*, 462 F.3d at 886).

As the court in *Ivey* found, because Plaintiff has been civilly committed as a sexually dangerous person, the appropriate standard to apply to Plaintiff's claims is "a version of the *Turner* test, moderated to account for the principles stated in *Senty-Haugen*."  *Id.*  Accordingly, the Court should adapt and apply the *Turner* factors to determine whether a certain policy or restriction is "reasonably related to legitimate institutional and therapeutic interests."  *Id.* at *5.

rights not inherently inconsistent with the circumstances of their detention. *Marsh v. Liberty Behavioral Health Care, Inc.*, No. 2:06-cv-125-Ftm-34SPC, 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008); *see also Turner*, 482 U.S. at 89; *Rivera v. Rogers*, 224 Fed. Appx. 148, 150–51 (3d Cir. 2007) (likening the plaintiff's status as a civilly committed sex offender to that of a prisoner and analyzing Rivera's First Amendment claim under case law interpreting a prisoner's rights). The First Amendment protects an inmate's right to receive mail. *Weiler v. Purkett*, 137 F.3d 1047, 1050 (8th Cir. 1998). However, that right may be limited by policies that are reasonably related to legitimate institutional and therapeutic interests. *See id.* (citing *Turner*, 482 U.S. at 92); *see also Ivey*, 2008 WL 4527792, at *5. A regulation limiting the receipt of packages is not facially invalid. *Weiler*, 137 F.3d at 1050–51. Prison authorities are given great deference in their administration of prison systems. *Turner*, 482 U.S. at 85. Most important here is that, as applied, short-term delay in the receipt of mail does not support a First Amendment cause of action. *See Sizemore v. Williford*, 829 F.2d 608, 610–11 (7th Cir. 1987) (stating that short, non-content based delays in prison mail are not unreasonable and fail to state a constitutional question); *see also Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999) (citing *Sizemore*, 829 F.2d at 610).

Here, Plaintiff does not allege that the MSOP mail policies at issue are not related to a legitimate institutional and therapeutic interest. And he acknowledges that he received the specific items that he references in his

76

Amended Complaint after a short delay.  Accordingly, Plaintiff's delay allegations do *not* state a claim for a First Amendment violation.

### (ii)    Claims related to free speech and right to privacy

The right to free speech includes "the right to utter or to print, . . . the right to distribute, the right to receive, the right to read," and the freedom of inquiry and thought.  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).  Although detainees retain their right to freedom of speech under the First Amendment, the right may be restricted.  *See Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979) ("[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.  Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights[.]" (quotations omitted)).

Plaintiff alleges that Defendants have established a policy of censoring portions of pages and sections from newspapers and other publications in violation of his constitutional rights.  He alleges that the censorship has occurred numerous times, and that he does not know specifically who censored the newspapers.  He does allege, however, that "on several occasions the parts of the newspaper that were removed pursuant to [D]efendants' censorship policy included articles about the Minnesota Sex Offender Program, the sexual predator statute or someone who was to be committed under the program."  (Am. Compl. ¶ 102.)  Defendants only argument for dismissal of Plaintiff's censorship claim is that it is "conclusory in failing to state sufficient facts as to how any of the named

Defendants were personally involved in any alleged unconstitutional censorship." (Doc. No. 17, Defs.' Mem. 16.)  This Court disagrees.  Plaintiff alleges that the named Defendants were responsible for establishing the censorship policy.  (Am. Compl. ¶ 102.)

At this stage this Court does not know what specific censorship policy is at issue, and does not have facts before it that would show whether the policy is reasonably related to legitimate institutional and therapeutic interests under the *Turner* factors.  But Plaintiff's allegations at least plausibly raise an issue that his First Amendment rights are possibly being violated by an overly restrictive censorship policy, especially in light of his allegations that articles about the Minnesota Sex Offender Program, the sexual predator statute, and someone who was to be committed under the program were censored, which all at least by their description sound as though they might be merely factual in nature and might not be reasonably related to legitimate institutional and therapeutic interests.  Accordingly, this Court recommends that Defendants' motion to dismiss Plaintiff's First Amendment claim based on censorship be denied.

Defendant also argues that Plaintiff has failed to state a First Amendment claim based on his allegation that Defendants have restricted access to vendors of his choice.  This Court concludes that to the extent that Plaintiff is asserting a First Amendment claim on his restricted access to vendors, that claim must fail as a matter of law.  Denial of access to the canteen and outside vendors "are *de*

*minimis* restrictions 'with which the Constitution is not concerned[.]'"  *Senty-Haugen*, 462 F.3d at 886 n.7 (*quoting Bell*, 441 U.S. at 539 n.21).[17]

Next, Defendants argue that Plaintiff has failed to state a First Amendment claim based on his allegations that he has no privacy when making telephone calls.  "[C]ivilly committed individuals have a First Amendment right to telephone access, subject to reasonable security limitations."  *Beaulieu*, 2008 WL 2498241, at *20 (quotations omitted) (citing cases).  Defendants assert that they "have a legitimate governmental interest in monitoring Plaintiff's activities in order to prevent contraband and to ensure a safe and secure environment" (Doc. No. 17, Defs.' Mem. 13), and they argue that the restrictions placed on Plaintiff's telephone use were reasonable under the *Turner* test.  (*Id.* at 15–16.)  But at this

---

[17]    Defendant also argues that Plaintiff's allegation that he was forced to return a television he purchased because it was not from an approved vender does not support a First Amendment claim.  This Court disagrees with Defendants that this allegation was necessarily asserted to support Plaintiff's First Amendment claim.  Construing Plaintiff's Amended Complaint liberally, this fact assertion could be stated in support of Plaintiff's Fourth Amendment claim. *See Beaulieu*, 2008 WL 2498241, at *15 (stating that "[p]ersonal property, such as televisions, are personal 'effects' protected by the Fourth Amendment").  In addition, Plaintiff asserts in his Amended Complaint that Defendants have denied him the right to have his television set sent to him by his parents.  (Am. Compl. ¶ 91.)  If Defendants ultimately show that the television set(s) was sent back because of the vendor policy, then as explained above, Plaintiff's claim is likely to fail.  However, as explained further below, taking Plaintiff's allegations as true, because no facts have been developed to date that explain whether there are more than one television set at issue, whether Plaintiff actually had possession of one of the television sets, whether Defendants' vendor policy applies to gifts from parents, and the reasons for why the television vender policy should apply to such gifts, and Plaintiff's Amended Complaint states a plausible claim for a Fourth Amendment violation.

stage, no facts have been developed by which the Court can analyze the *Turner* factors, and this Court will not conclude that Defendants actions were reasonable under the *Turner* test just because Defendants say it is so. Therefore, based on the facts alleged in the Amended Complaint, this Court concludes that Plaintiff's First Amendment claim based on the privacy restrictions placed on his telephone usage, including the alleged monitoring of all calls, survives Defendants' motion to dismiss.

### (iii)    Claims related to freedom of association

Plaintiff makes several allegations that, taken as true, indicate that he is not freely allowed to associate with others. For example, Plaintiff alleges that Defendants have a separation policy that prohibits Plaintiff and other MSOP residents who have filed lawsuits from speaking with other MSOP residents who have not filed lawsuits (Am. Compl. ¶ 81), that residents such as Plaintiff that are housed in the Behavioral Therapy Unit are not allowed to speak to other residents when passing by or allowed to great them or shake their hand (*Id.* ¶ 83), that Defendants have arbitrarily denied Plaintiff visitation privileges with his family and friends (*Id.* ¶ 105), and that Defendants have placed various excessive visitation restrictions on Plaintiff, such as limiting who may visit, when and how often people can visit (i.e., only on Saturdays, Sundays, and Holidays from 1:00pm to 4:30pm), and placing various physical restrictions on Plaintiff during visits. (*Id.* ¶ 107.)

The Supreme Court has held that prisoners do not enjoy the absolute right

80

of freedom of association:

> The very object of imprisonment is confinement. Many of the
> liberties and privileges enjoyed by other citizens must be
> surrendered by the prisoner. An inmate does not retain rights
> inconsistent with proper incarceration . . . . And, as our cases have
> established, freedom of association is among the rights least
> compatible with incarceration . . . . Some curtailment of that freedom
> must be expected in the prison context.

*Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (citations omitted). Although

Plaintiff is civilly committed as a dangerous sex offender, and is not a prisoner,

like inmates, civilly committed sexual offenders do not retain rights inconsistent

with their status. *See Senty-Haugen*, 462 F.3d at 886.

Defendants correctly point out that MSOP provides treatment to

dangerous, civilly committed sexual offenders, and must maintain a secure, safe

and orderly environment for staff and patients. (Doc. No. 17, Defs.' Mem. 14

(citing Minn. R. 9515.3080, subp. 1).) However, the Minnesota Rule specifically

states that it "must develop and follow policies and procedures for maintaining a

secure and orderly environment that is safe for person in treatment and staff *and

supportive of the treatment program*." Minn. R. 9515.3080, subp. 1 (emphasis

added). Therefore, safety is not the only concern that must be considered when

evaluating whether MSOP's policies and procedures are reasonable. While

Defendants argue that under *Turner*, MSOP's "restriction from speaking to others

concerning ongoing litigation is rationally related to a legitimate therapeutic and

security purpose," they in no way explain why this is so. (Doc. No. 17, Defs.'

Mem. 14.) Nor are there facts before this Court at this stage by which the Court

can properly analyze all of the *Turner* factors.  Therefore, this Court concludes

that Defendants' motion to dismiss should be denied with respect to Plaintiff's

First Amendment claim to the extent it is based on restrictions that affect his

freedom of association.

### (iv)    Claims related to retaliation

Plaintiff claims that Defendants have retaliated against him after he

complained internally and after he filed his original Complaint in this matter by

failing to provide him treatment, denying him meals, having him "written up" after

emotional outbursts, denying him the right to telephone Legal Aid, denying him

the right to obtain copies of policies, misplacing his property, denying him

recreation, denying him more than one hour breaks per day, delaying him mail,

and conducting lockdowns.  (Am. Compl. ¶¶ 86, 112–15.)

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, a

plaintiff must show:

> (1) he engaged in a protected activity, (2) the government official
> took adverse action against him that would chill a person of ordinary
> firmness from continuing in the activity, and (3) the adverse action
> was motivated at least in part by the exercise of the protected
> activity.

*Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (citing *Naucke v. City of*

*Park Hills*, 284 F.3d 923, 927–28 (8th Cir. 2002)).  "[A]n act in retaliation for the

exercise of a constitutionally protected right is actionable under

Section 1983 even if the act, when taken for a different reason, would have been

proper."  *Madewell*, 909 F.2d at 1206 (quotations omitted).  For example, prison

82

officials may not impede access to courts through retaliation, such as harassment or less favorable treatment, for inmates' litigation activities. *Sanders v. St. Louis County*, 724 F.2d 665, 666 (8th Cir. 1983).

Defendants argue that Plaintiff's retaliation claim should be dismissed because they assert Plaintiff's allegations are "conclusory, involve de minimus acts for which the constitution is not concerned, and generally fail to state sufficient facts supporting a retaliation claim." (Doc. No. 17, Defs.' Mem. 18.) More specifically, Defendants assert that Plaintiff has not plead facts showing a casual connection between the filing of his case and the alleged acts made by Defendants. (*Id.*) Basically, Defendants ask this Court to dismiss Plaintiff's claim because they dispute that the acts were done for a retaliatory reason.

This Court rejects Defendants argument. "[T]he alleged manifestations of defendants' retaliation (such as less favorable treatment) need not themselves amount to constitutional violations. The violation lies in the *intent* to impede access to the courts." *Madewell*, 909 F.2d at 1206–07 (alteration in original). And this Court must "accept the allegations contained in the Complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). Further, under the notice pleading standard of the Federal Rules, Plaintiff is only required to give a 'short and plain statement' of his claims. Fed. R. Civ. P. 8(a)(2). Thus, when reviewing the sufficiency of a complaint before receiving any evidence, our task is a limited one. "The issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Twombly*, 550 U.S. at 570 (concluding that to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face"). Therefore at this stage of the case, this Court does not assume that Plaintiff cannot and will not develop and prove any facts to support his claim that Defendants retaliated against him for his filing of his Complaint. Because this Court finds that Plaintiff has met his notice pleading requirement for his retaliation claim, it recommends that Defendants' motion to dismiss in this respect should be denied.

### (v)    Claims related to religion

As explained above, Plaintiff does not have standing to assert a claim based on the alleged violation of another resident's right to religious freedom. But Plaintiff does have standing to assert a claim based on injuries that he has incurred based on alleged unconstitutional restrictions Defendants have applied constraining his religious beliefs. *See Lujan*, 504 U.S. at 561. Here, Plaintiff alleges that Defendants have denied him the right to celebrate religiously with food with others. (Am. Compl. ¶ 186.) He alleges that he was allowed only one feast a year, even though he and other residents were willing to pay for the food at the feasts. (*Id.*) Plaintiff also alleges that Defendants have a policy whereby they monitor him during religious services, and monitor him when speaking with clergy or other religious volunteers. (*Id.* ¶ 91.)

Eventually, Plaintiff will be required to raise a material question of fact regarding whether Defendants have placed a "substantial burden" on his ability to practice his religion. *See Patel*, 515 F.3d 813. Substantially burdening one's free exercise of religion means that the regulation or policy –

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (quotations and alterations omitted). Defendants argue that Plaintiff's Free Exercise Clause claim should be dismissed because Plaintiff has not shown that by denying him the ability to attend a feast Defendants have violated a "sincerely held religious belief." (Doc. No. 17, Defs.' Mem. 20.) But Defendants are putting the cart before the horse. This case is only at the pleading stage, and Plaintiff is not required at this stage to have proven his claim in his pleading. *See Scheuer*, 416 U.S. at 236 (stating that when reviewing the sufficiency of a complaint before receiving any evidence "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." (quotations omitted)). Because Plaintiff has put Defendants on notice of a plausible Free Exercise Clause claim, Defendant's motion to dismiss in this respect should be denied and Plaintiff's claims based on a First Amendment violation of his rights to freedom of religion, which are contained in his Second

and Seventh Causes of Action, should remain.

### D.    Fourth Amendment Claim

Plaintiff alleges that Defendants have violated his Fourth Amendment

Right to be free from unreasonable searches and seizures by (1) requiring him to

submit to strip searches after contact visits (even though he is observed the

entire time and subjected to restrictions regarding his conduct during visitation),

before and after being transported from the facility, and when being placed in

isolation; (2) by requiring him to be handcuffed and shackled during transport;

and (3) by conducting random, unreasonable and unwarranted searches of his

quarters, property, and person.[18]

Under the Fourth Amendment, "[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  In *Bell v. Wolfish*,

the Supreme Court addressed the reasonableness of a search or seizure in an

institutional setting, stating, "The Fourth Amendment prohibits only unreasonable

---

[18]    Plaintiff asserts that his Fourth Amendment rights were violated by way of
unreasonable searches and seizures and by the unreasonable invasion of his
privacy.  (*See* Am. Compl. ¶¶ 201–02 (stating Third Causes of Action titled
"Unreasonable Searches and Seizures" and Fourth Cause of Action titled
"Invasion of Privacy").)  The Constitution does not expressly provide for a right to
privacy.  However, the Supreme Court has recognized that a right to privacy may
exist in relation to other specifically enumerated rights.  *See, e.g.*, *Terry v. Ohio*,
392 U.S. 1, 8–9 (1968) (stating that the Fourth Amendment protects areas in
which one has a reasonable expectation of privacy from unreasonable searches
and seizures).  Because Plaintiff has asserted his invasion of privacy claim in the
context of a Fourth Amendment violation, this Court addresses the Fourth
Amendment issues together.

searches," and to determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." 441 U.S. at 558–59. In balancing the need for the particular search (and resulting seizure) against the invasion of personal rights, a court must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.* at 559. In addition, a court must take into account the expert judgment of officials adopting and implementing the policies at issue. *Id.* at 547. *Bell* places a "heavy burden" on Plaintiffs to show that institution officials, in initiating the policies at issue, "exaggerated their response to the genuine security considerations that actuated these restrictions and practices." *Id.* at 562.

The Eighth Circuit has held that involuntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches, analogous to the right retained by pretrial detainees. *Serna*, 567 F.3d at 948. Therefore, while such persons are entitled to more considerate treatment and conditions than criminals, their rights must still be balanced against the interests of the state. *See Youngberg*, 457 U.S. at 321–22. Accordingly, "not all search techniques may be swept under the rug of deference to the detention-center decisionmakers[.]" *Serna*, 567 F.3d at 955. For example, in *Serna*, a MSOP patient challenged a facility-wide visual body cavity search after a cell phone case was found in a facility common area. *Id.* at 946. Cell phones are

contraband at MSOP because they are considered a security and treatment risk. *Id.* at 953. The court rejected the defendants' attempt to establish a broad rule that any suspicion of contraband is sufficient to justify facility-wide, visual body-cavity searches. *Id.* But ultimately, the court upheld the reasonableness of the searches, determining that although they were invasive, they were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones. *Id.* at 955–56.

Applying the standards set forth in *Bell*, and relying on the conclusions reached in other cases regarding various searches, Defendants argue that Plaintiff's Fourth Amendment claims should be dismissed because all of Plaintiff's allegations involve the application of a legitimate security concern and therefore any searches were reasonable. However, the Supreme Court in *Bell* instructs that the balancing that needs to be done to determine the reasonableness of a search must be done on a case-by-case basis and requires at least some evidentiary record:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*, 441 U.S. at 559. Here, the record before this Court includes no facts that would allow this Court to evaluate the factors necessary to determine if the alleged search policies and searches conducted in this case are reasonable and

88

appropriate.  At this stage, the Court must take Plaintiff's allegations as true and it is confined by the allegations alleged in the Complaint.  Facts relating to the scope of the searches, the manner in which they were conducted, the justifications for the searches, and the places in which they were conducted are yet to be developed.  Although Defendants may ultimately prove that the various searches are reasonable, this case is only at the pleading stage.  And because Plaintiff has pleaded viable Fourth Amendment claims, this Court concludes that the motion to dismiss those claims should be denied.

Plaintiff also alleges that Defendants, in violation of his constitutional rights, require him to be shackled and handcuffed anytime he is transported by MSOP personnel and that in one instance he was handcuffed and shackled in a cell with a camera and no running water.  (*See* Am. Compl. ¶¶ 91, 110.) Defendants only argument in its motion as to this claim is that "[t]he use of restraints such as handcuffs and shackles during transport is not constitutionally offensive in light of the MSOP's security concerns."  (Doc. No. 17, Defs.' Mem. 22 (citing *Semler*, 2010 WL 145275, at \*26–27 (finding on a motion to dismiss that MSOP's full restraint policy did not violate substantive due process)).) Notably, the court in *Semler* was not confined to the Complaint's allegations, as the Court is here; the *Semler* court had the benefit of having a record including the reasons and rationale for the restraint policy, which were found in exhibits attached to the Complaint.  Here, the Court does not even have evidence of the alleged policy before it.  And moreover, "[t]he test as to whether a governmental

action is appropriate under the Fourth Amendment in this context is whether the 'offending' action is reasonable given the rights of the plaintiffs and the interests of the Program." *Beaulieu*, 2008 WL 2498241, at *14 (citing *Bell*, 441 U.S. at 559, and *Youngberg*, 457 U.S. at 324 (holding that a committed individual "enjoys constitutionally protected interests in conditions of reasonable care and safety, *reasonably nonrestrictive confinement conditions*, and such training as may be required by these interests") (emphasis added)).

Plaintiff has alleged that Defendants are implementing a blanket policy mandating handcuffing and shackling during transport (and it appears Defendants may have a policy requiring restraints when placing Plaintiff in an isolation cell). Again, this Court cannot look outside of the Complaint to determine the extent of the restraints and if Defendants have a valid rationale for their restraint policy, factors that are necessary in determining whether Defendants' policies are reasonable. Assuming Plaintiff's allegations are true, this Court concludes that Plaintiff has adequately stated a Fourth Amendment claim related to Defendants' use of shackles and handcuffs, and Defendants' motion to dismiss this claim should be denied.

Also encompassed by Plaintiff's Fourth Amendment claim is Plaintiff's allegation that he was forced to return a television he received from his parents, and that his hotpot was taken from him. (Am. Compl. ¶¶ 91, 144.) A seizure of property occurs when there is "some meaningful interference with an individual's possessory interest in that property." *Johnson v. Outboard Marine Corp.*, 172

90

F.3d 531, 536 (8th Cir. 1999) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)).  And "[p]ersonal property, such as televisions, are personal 'effects' protected by the Fourth Amendment."  *Beaulieu*, 2008 WL 2498241, at *15 (citing *Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005)).  By requiring Plaintiff to send back his television set, and by taking away his hotpot, Defendants have interfered with Plaintiff's possessory rights in those items.

As stated above, Plaintiff retains constitutional rights despite his commitment, including basic Fourth Amendment rights against unreasonable seizures.  *See Bell*, 441 U.S. at 545.  "[W]hen an institutional restriction infringes a specific constitutional guarantee, . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security."  *Id.* at 546.  Here, there are no facts before this Court that would explain the reasons for the policy restricting Plaintiff from having his own television or his own hotpot.  Therefore, accepting Plaintiff's allegations as true, this Court concludes that Plaintiff has stated a plausible claim for relief.

Accordingly, this Court recommends that Defendants' motion to dismiss should be denied with respect to Plaintiff's Fourth Amendment claims, and Plaintiff's Third Cause of Action titled "Unreasonable Searches and Seizures" and Fourth Cause of Action titled "Invasion of Privacy" should survive the

pleading stage.[19]

_____

[19]    Plaintiff alleges that Defendants have unreasonably disallowed him the right to possess various property, including furniture, articles in newspapers, a computer, a hotpot, gaming systems, a television, a DVD player, and DVDs, and have done so without providing him constitutionally required due process. (Am. Compl. ¶¶ 71, 103, 140–42, 144–45.) Defendants argue that none of these items constitute a constitutionally protected interest, and therefore any procedural due process claims related to the property limitations should be dismissed.

A procedural due process claim "is cognizable only if there is a recognized liberty or property interest at stake." *Johnson v. City of Minneapolis*, 152 F.3d 859, 861 (8th Cir. 1998). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies[.]" *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). This Court concludes that there is no liberty interest in having these items. And for a property interest to arise, a plaintiff must have more than "mere subjective expectancy." *Batra v. Bd. of Regents of the Univ. of Neb.*, 79 F.3d 717, 720 (8th Cir. 1996). Property interests "are created . . . by existing rules or understandings that stem from an independent source such as state law[.]" *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

"There is no Minnesota statute giving civilly committed individuals generally, or Program detainees, specifically, the right to possess all of their property." *Beaulieu*, 2008 WL 2498241, at *16; *see also Pyron v. Ludeman*, Nos. 10-3759 (PJS/JJG), 10-4236 (PJS/JJG), 2011 WL 3293523, at *7 (D. Minn. June 6, 2011) (stating that "[n]o federal, state or local statute creates a property right for Plaintiffs to possess computers and electronics, electric toothbrushes, electric fans, or unlimited amounts of personal property and clothing" (quotations omitted) (citing cases)). Therefore, Plaintiff does not have a protected property interest in the items listed above so as to invoke procedural due process protections. Accordingly, Defendants' motion to dismiss Plaintiff's procedural due process claims as they relate to the above described property limitations should be granted and the claims dismissed with prejudice.

Defendants argue in somewhat of a conclusory fashion that Plaintiff's procedural due process claims based on various alleged liberty interests should be dismissed as well. For the most part, Defendants assert that the interest Plaintiff complains about is *de minimis*, or that Plaintiff knew why the action was taken because it was done in response to a rule violation or misbehavior. As

(Footnote Continued on Next Page)

### E.    Sixth Amendment Claim

Plaintiff alleges that his Sixth Amendment right of access to the courts has

been violated through the denial of access to legal materials and counsel.[20]   The

_____

(Footnote Continued from Previous Page)
explained above, Plaintiff alleges that Defendants have taken various actions that
are punitive in nature and that were not made for any legitimate security or
treatment concerns, and that he is being confined in punitive conditions that are
antithetical to the treatment purpose of the confinement.  He also alleges that
that when some of the punitive conditions were employed, he was either not
given notice or was not given an opportunity for a hearing.  (*See* Am. Compl.
¶¶ 43, 48, 59, 65, 75, 78, 84.)  Taking Plaintiff's allegations as true, and without
further development of the facts to support Defendants' arguments, this Court
finds that Plaintiff's allegations support both plausible substantive due process
and procedural due process claims.  Accordingly, this Court recommends that
Defendants' motion to dismiss Plaintiff's procedural due process claims as they
relate to various alleged liberty interests should not be granted and those
procedural due process claims should survive.

[20]     Plaintiff has also filed a Motion to Take Judicial Notice of Facts Pursuant to
Fed. R. Evid. 201.  (Doc. No. 27.)  Therein, Plaintiff asks the Court to take judicial
notice of the facts submitted in the 2011 Auditor's Report and to appoint counsel
for him.  As explained above, this Court has considered the 2011 Auditor's
Report in ruling on Defendants' motion to dismiss because it is part of the public
record and necessarily embraced by the pleadings.  *See Porous*, 186 F.3d at
1079; *Piper Jaffray*, 967 F. Supp. at 1152.  Therefore, there is no need for the
Court to further take "judicial notice" of the Report.

However, in light of this Court's recommendation to deny Defendants'
motion in part, and in light of the complexity of the constitutional issues
presented, this Court finds Plaintiff's request for the appointment of counsel
somewhat compelling.  But *pro se* litigants do not have a constitutional or
statutory right to counsel in civil cases.  *Stevens v. Redwing*, 146 F.3d 538, 546
(8th Cir. 1998).  Rather, the appointment of counsel is a matter of the court's
discretion.  *Mosby v. Mabry*, 697 F.2d 213, 214 (8th Cir. 1982); *see also* 28
U.S.C. § 1915(e)(1) (stating that the court may "request an attorney to represent
any person unable to afford counsel").  The standard for appointment of counsel
in such cases is whether both petitioner and the court would benefit from the
assistance of counsel.  *Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986);
(Footnote Continued on Next Page)

Sixth Amendment expressly applies to criminal actions. Plaintiff's § 1983 case is not a criminal proceeding and does not implicate the Sixth Amendment as a matter of law. Furthermore, Plaintiff has not plead facts showing that Defendants have interfered with his ability to pursue his legal claims, i.e., actual injury, as necessary to establish a violation of the right of access to the courts under the First, Sixth, and Fourteenth Amendments. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996) ("[T]he inmate . . . must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."). Therefore, Plaintiff has not plead a plausible

_____

(Footnote Continued from Previous Page)
*see also Plummer v. Grimes*, 87 F.3d 1032, 1033 (8th Cir. 1996) ("A district court is to decide whether the plaintiff and the court will substantially benefit from the appointment of counsel[.]"). Among the factors the court should consider are "the factual complexity of the issues; the ability of an indigent to investigate the facts; the existence of conflicting testimony; the ability of an indigent to present his claim; and the complexity of the legal issues." *Nachtigall v. Class*, 48 F.3d 1076, 1081–82 (8th Cir. 1995). After reviewing these factors, this Court finds that the legal issues involved in this case are so complex as to warrant appointment of counsel at this time. It is apparent through the pleadings that there likely will be conflicting testimony and that there may be evidentiary issues, presentation of such to the Court will require the skillful and practiced questioning techniques associated with representation by legal counsel. Although Plaintiff has the threshold ability to articulate his claims and to communicate effectively with the Court, this Court believes that the complexity of the constitutional issues and Plaintiff's lack of legal knowledge will present him with such disadvantages that appointment of counsel would substantially benefit the Court and Plaintiff.

Accordingly, this Court recommends that Plaintiff's Motion to Take Judicial Notice of Facts Pursuant to Fed. R. Evid. 201 (Doc. No. 27), be denied in part as moot with respect to Plaintiff's request to take judicial notice, and granted in part with respect to Plaintiff's request for the appointment of counsel. This Court recommends that the District Court submit Plaintiff's case to the FBA Referral Project for placement.

claim for relief for any constitutionally significant interference with his ability to pursue a legal action.  Therefore, this Court recommends that Plaintiff's Fifth Cause of Action titled "Denial of Access to Legal[] Materials and Counsel" be dismissed with prejudice.

### F.    Ninth Amendment Claim

As referenced above, in the body of Plaintiff's Amended Complaint, in the section purportedly relating to his claim under the Minnesota Human Rights Act, Plaintiff references violations of the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments.  (Am. Compl. ¶ 195.)  Nowhere else does Plaintiff mention the Ninth Amendment.  As Defendants have correctly pointed out, "the Ninth Amendment creates no rights that are independent of other constitutional rights."  *Knutson v. Ludeman*, No. 10-357 (PJS/LIB), 2011 WL 821253, at *8 n.6 (D. Minn. Jan. 12, 2011) (citing *Perry v. Lackawanna Cnty. Children & Youth Servs.*, 345 Fed. Appx. 723, 726 (3d Cir. 2009) (unpublished opinion) ("[T]he Ninth Amendment does not independently provide a source of individual constitutional rights.")).  Therefore, to the extent that Plaintiff is seeking relief based on the Ninth Amendment, the Court finds that his claim is effectively subsumed within his Fourteenth Amendment due process claims.

## V.    Claims Asserted Under 42 U.S.C. § 1985

In addition to § 1983, Plaintiff asserts that this Court has jurisdiction pursuant to 42 U.S.C. § 1985(2).  Section 1985 states, in pertinent part, that it is a conspiracy to interfere with civil rights:

95

> . . . if two or more persons conspire for the purpose of impeding,
> hindering, obstructing, or defeating, in any manner, the due course
> of justice in any State or Territory, with intent to deny to any citizen
> the equal protection of the laws, or to injure him or his property for
> lawfully enforcing, or attempting to enforce, the right of any person,
> or class of persons, to the equal protection of the laws[.]

42 U.S.C. § 1985(2). To establish a violation under § 1985, a plaintiff must prove

that a civil conspiracy existed, that its purpose was to deprive him of his civil

rights, and that a conspirator did an act in furtherance of that purpose.

Speculation and conjecture are not enough. *Mettler v. Whitledge*, 165 F.3d

1197, 1206 (8th Cir. 1999). To withstand a motion to dismiss, "allegations of a

conspiracy must be pleaded with sufficient specificity and factual support to

suggest a meeting of the minds." *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th

Cir. 1985) (quotations omitted).

Outside of quoting the statute and the elements required for proof of a

claim, Plaintiff states in his Introduction that "[t]he defendants are acting in direct

concert with each other to violate Mr. Thompson's civil rights in violation of the

civil conspiracy act pursuant to title 42 USC § 1985." (Am. Compl. at 2.) He then

alleges that "[d]uring the 2011 Legislation session defendant Mr. Cal R. Ludeman

was recently caught 'hiding' important documents to the legislature that would

support plaintiff's claim of conspiracy to interfere with his rights." (*Id.*) Later,

Plaintiff alleges the following:

> Defendants have an unconstitutional policy that allows them to
> attack and provoke mental and emotional outbursts out of
> Mr. Thompson. This policy requires that the MSOP employees are
> Complying with Frank Milczark's written directive "Program notes

should include factors that justify need for continued stay" . . . . This is evidence that the defendants are conspiring against Mr. Thompson's right to receive rehabilitation in violation of 42 U.S.C. § 1985(3). Moreover, the audit report submitted to the Minnesota legislature is telling . . . of the entire scheme by the defendants to create funding to build a prison setting based on Mr. Thompson's label as a "sexual psychopath personality and sexually dangerous person".

(Am. Compl. ¶ 187.) Plaintiff's allegation about Mr. Ludeman does not explain with whom Mr. Ludeman was conspiring, and Plaintiff's theory that Defendants provoked him in order to build a record against his release is speculative. The policy, as Plaintiff quotes it, provides Plaintiff protection rather than supports a conspiracy – the policy requires that MSOP staff justify in writing why there is a need for a resident's continued stay, rather than for staff to arbitrarily say so. Further, by citing the 2011 Auditor's Report, Plaintiff has not specified how there was a meeting of the minds or between whom. Therefore, this Court concludes that Plaintiff's Amended Complaint does not contain facts supporting a conspiracy – he alleges no facts suggesting who the specific conspirators were or what they did in relation to the conspiracy, and he alleges no facts supporting that there was any sort of agreement to deprive him of his constitutional rights. Therefore, any purported claim asserted under § 1985 should be dismissed.[21]

_____

[21]    Plaintiff also asserts violations in a conclusory fashion of "42 U.S.C. §§ 200a. Prohibition against discrimination to redress the deprivation of service, Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C. § 12101 et seq., and Rehabilitation Act of 1973, § 504(1), as amended, 29 U.S.C. § 794(a)." (Am. Compl. ¶ 188.) However, similar to above, Plaintiff has not pleaded any facts
(Footnote Continued on Next Page)

## VI.    Plaintiff's State Law Claims

In Plaintiff's Amended Complaint, he asserts that Defendants have violated

the Minnesota Human Rights Act, and have been negligent in hiring MSOP staff.

In addition, he lists two separate causes of action for intentional infliction of

emotional distress and negligent infliction of emotional distress (i.e., Plaintiff's

Eleventh Cause of Action and Plaintiff's Twel[f]th Cause of Action).  The only

argument that Defendants present for dismissal of Plaintiff's state statutory and

common law claims is that "[t]his Court should decline to exercise supplemental

jurisdiction if it dismisses Plaintiff's federal claims."  (Doc. No. 17, Defs.' Mem.

42.)

Pursuant to 28 U.S.C. § 1367(c)(3), a court may decline to exercise

supplemental jurisdiction over a claim if the "court has dismissed all claims over

which it has original jurisdiction[.]"  And, though the district court has discretion in

determining whether to exercise jurisdiction over pendant state law claims, the

federal court should "exercise judicial restraint and avoid state law issues

wherever possible."  *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp.

2d 694, 711 (D. Minn. 1998) (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d

215, 220 (8th Cir. 1990)).  "[W]hen state and federal claims are joined and all

federal claims are dismissed on a motion for summary judgment, the state claims

---

(Footnote Continued from Previous Page)
that would state a claim under any of those provisions, and these claims should
be dismissed.

are ordinarily dismissed without prejudice to avoid needless decisions of state

law . . . as a matter of comity." *Am. Civil Liberties Union v. City of Florissant*, 186

F.3d 1095, 1098–99 (8th Cir. 1999) (quotations omitted).  Here, this Court

recommends that certain federal claims under § 1983 should not be dismissed.

Under these circumstances, and because Defendants have limited their

argument for dismissal to only one based on the assumption that the Court would

dismiss all claims over which it has original jurisdiction, this Court recommends

that Defendants' motion to dismiss the above state law claims be denied.[22]

Plaintiff also cites to various sections of the Minnesota Constitution in

support of his first ten causes of action.  Any claims asserted under the

Minnesota constitution should be dismissed because "[u]nlike 42 U.S.C. § 1983,

Minnesota has no statutory scheme providing for private actions based on

violations of the Minnesota constitution."  *Riehm v. Engelking*, No. 06-293

(JRT/RLE), 2007 WL 37799, at *8 (D. Minn. Jan. 4, 2007) (citing *Guite v. Wright*,

976 F. Supp. 866, 871 (D. Minn. 1997)).  Accordingly, Defendants' motion to

dismiss the claims arising under the Minnesota constitution should be granted.

## VII.    Qualified Immunity

The doctrine of qualified immunity protects "government officials

performing discretionary functions . . . from liability for civil damages insofar as

---

[22]    This Court notes that it has not reviewed the Amended Complaint for
sufficiency as to the state law claims because that issue was not put before it by
Defendants.  Therefore, this Court offers no opinion as to whether Plaintiff has
properly stated a claim for relief under those claims.

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This Court considers two questions to determine whether Defendants are protected by qualified immunity: (1) whether the facts that Plaintiff has alleged or shown, when viewed in his favor, support a finding that the conduct of Defendants violated a constitutional right; and (2) whether that constitutional right was "clearly established" at the time of the incidents such that a reasonable official would have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions." *Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 528 (8th Cir. 2009).

Defendants assert they are entitled to qualified immunity from liability of all of Plaintiff's claims because they assert that Defendants have not violated Plaintiff's constitutional rights. But as explained above, Plaintiff has alleged facts, when viewed in his favor, support claims that Defendants' conduct violated various constitutional rights that are clearly established. And a party is not entitled to dismissal on qualified immunity grounds where genuine dispute exists concerning predicate facts material to the issue. *Wiegand v. Spadt*, 317 F. Supp. 2d 1129, 1137 (D. Neb. 2004) (citing *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)). "Predicate facts" consist of "only the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions." *Id.* at 1137 n.3 (citing *Pace*,

201 F.3d at 1056).  Based on the facts pleaded in Plaintiff's Amended Complaint, this Court cannot conclude that Defendants' actions under the alleged circumstances were "objectively reasonable."  Therefore, this Court concludes that Defendants are not entitled to qualified immunity at this time.

## CONCLUSION

This Court notes that Plaintiff faces a very difficult burden going forward in this case on the various claims that this Court has recommended survive the pending motion to dismiss.  The state must be afforded a great deal of discretion and flexibility in treating sexually dangerous patients in custody, and this means that the Court will show a great deal of deference to decisions to restrict patients from engaging in behavior that detracts from treatment goals and implicates the safety of the staff and other patients.

But this Court also recognizes that patients do not surrender all constitutional rights by their lawful detention in a treatment facility.  *See Turner*, 482 U.S. at 84 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.").  The allegations in Plaintiff's Amended Complaint—especially those related to the lack of treatment being provided and the apparent punitive-like nature of his confinement—do, when read in total and in the light most favorable to Plaintiff, raise serious concerns about ongoing constitutional violations.  If this Court were to accept Defendants' approach to the dismissal of cases such as this one, then it is hard to envision any circumstance where an involuntarily committed patient could assert a challenge to the violation

101

of his or her constitutional rights.  All that the defendants would have to do to obtain dismissal of such claims would be to assert the general constitutionality of the institution's policies without ever addressing their application in a particular case.  This Court finds this prospect troubling.  Those who are indefinitely detained in civil commitment in the MSOP are, as a group, particularly vulnerable to civil rights abuses because of their status as sexually dangerous persons or sexually psychopathic personalities.  Thus, in cases like this one, the federal court must closely scrutinize claims that a detainee's federal constitutional rights are being violated by, for example, the failure to provide mental health treatment and the imposition of punitive confinement.  As a result, this Court recommends as follows.

## RECOMMENDATION

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. No. 15), be **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is recommended that:

a.    Defendants' Motion to Dismiss be **GRANTED** as follows:

(i)    Plaintiff's claims made on behalf of other MSOP residents be dismissed with prejudice;

(ii)    To the extent Plaintiff's claims for damages are asserted against Defendants for actions taken in their official capacities, those

102

claims be dismissed with prejudice;

(iii)    Plaintiff's Fifth Amendment claims be dismissed with prejudice;

(iv)    Plaintiff's First Amendment cruel and unusual punishment claim be dismissed with prejudice;

(v)    Plaintiff's inadequate medical care claims be dismissed with prejudice;

(vi)    Plaintiff's equal protection claims be dismissed with prejudice;

(vii)    Plaintiff's Tenth Cause of Action titled "Denial of the Right to be Free from Double Jeopardy" be dismissed with prejudice;

(viii)    Plaintiff's First Amendment claims based on delay of mail and restricted access to vendors be dismissed with prejudice;

(ix)    Plaintiff's procedural due process claims as they relate to the alleged property limitations be dismissed with prejudice;

(x)    Plaintiff's Fifth Cause of Action titled "Denial of Access to Legal[] Materials and Counsel" be dismissed with prejudice;

(xi)    Plaintiff's claim asserted under 42 U.S.C. § 1985, be dismissed with prejudice;

(xii)    Plaintiff's Americans with Disabilities Act and Rehabilitation Act claims be dismissed with prejudice;

(xiii)    Plaintiff's claims arising under the Minnesota

103

constitution be dismissed with prejudice;

b.      Defendants' motion be **DENIED** in all other respects, including as to the following:

(i)      Plaintiff's First Cause of Action ("Failure to Provide Treatment"/Fourteenth Amendment claim);

(ii)      Thirteenth Cause of Action ("Violation of Court Ordered Treatment");

(iii)     Sixth Cause of Action ("Denial of the Right to be Free from Punishment"/Fourteenth Amendment claim);

(iv)     Eighth Cause of Action ("Denial of Less Restrictive Alternative"/Fourteenth Amendment claim);

(v)      Seventh Cause of Action ("Denial of the Right to Religion and Religious Freedom"/First and Fourteenth Amendment claims);

(vi)      Ninth Cause of Action ("Denial of the Right to be Free F[ro]m Cruel and Unusual Punishment"/Fourteenth Amendment claim);

(vii)     Second Cause of Action ("Unreasonable Restriction of Free Speech"/First Amendment claims based on censorship, privacy restrictions placed on his telephone usage, freedom of association, retaliation, freedom of religion);

(viii)    Third Cause of Action ("Unreasonable Searches and

Seizures"/Fourth Amendment claim);

       (ix)    Fourth Cause of Action ("Invasion of Privacy"/Fourth

Amendment claim);

       (x)    Procedural due process claims as they relate to the

alleged liberty interests;

       (xiii)  The Minnesota Human Rights Act claim, the negligent

hiring claim, the Eleventh Cause of Action ("Intentional Infliction of

Emotional Distress"), and the Twelfth Cause of Action ("Negligent

Infliction of Emotional Distress"); and

       (xiv)  Qualified immunity.

       2.    Plaintiff's Motion to Take Judicial Notice of Facts Pursuant to Fed. R.

Evid. 201 (Doc. No. 27), be **DENIED IN PART AS MOOT** with respect to

Plaintiff's request to take judicial notice, and **GRANTED IN PART** with respect to

Plaintiff's request for the appointment of counsel.  This Court recommends that

the District Court submit Plaintiff's case to the FBA Referral Project for

placement.


Date:  January 11, 2012

                        *s/ Jeffrey J. Keyes*
                        JEFFREY J. KEYES
                        United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 25, 2012**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure

to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.